A98A1698. DOW CHEMICAL COMPANY v. OGLETREE, DEAKINS, NASH, SMOAK & STEWART.
(514 SE2d 836)

RUFFIN, Judge.

Dow Chemical Company (Dow) sued Ogletree, Deakins, Nash, Smoak & Stewart (Ogletree) for legal malpractice, alleging that Ogletree negligently handled a federal lawsuit that resulted in a $2,450,000 judgment against Dow. Among other things, Dow alleged that Ogletree negligently failed to file a timely appeal of the jury's verdict. Both parties moved for partial summary judgment on the issue of Ogletree's liability for its failure to file a timely appeal. The trial court granted Ogletree's motion for partial summary judgment on this issue and denied Dow's motion. For reasons discussed below, we affirm.

"A professional malpractice action is merely a professional negligence action. To state a cause of action for negligence in Georgia, the following elements are essential: (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty. In particular, this court has held that in a suit for legal malpractice, proof that the attorney's negligence proximately caused the client's harm is necessary for recovery." (Citations and punctuation omitted.) *Whitehead v. Cuffie*, 185 Ga. App. 351, 352 (364 SE2d 87) (1987); see also OCGA § 51-1-8. Faced with such a claim, a defendant is entitled to favorable resolution summarily if he can show that the record reveals "that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); OCGA § 9-11-56.

*McMann v. Mockler*, 233 Ga. App. 279, 280 (1) (503 SE2d 894) (1998).

The relevant facts are as follows. In October 1988, several plaintiffs filed a diversity action against Dow in the United States District Court for the Northern District of Georgia, *Mr. and Mrs. Jesse Pinion,*

*Maurice Daffron & Shirley Daffron v. Dow Chem. U.S.A.*, Civil Action No. 4:88-0261-HLM. The complaint alleged that Dow operated a chemical plant on land adjacent to plaintiffs' farm, and that toxic substances from the plant leaked into the ground, contaminating the soil and groundwater on plaintiffs' property.

Ogletree represented Dow in the *Pinion* case, which was tried to a jury in January 1990. The evidence at trial showed that Dow built its latex manufacturing plant in Dalton, Georgia in 1966. The manufacturing process generated wastewater containing latex solids, which had to be removed from the water before the water could be discharged. Dow dug unlined coagulation ponds in the clay soil and stored wastewater in the ponds to let the latex solids settle to the bottom. Each of these coagulation ponds was approximately the size of a football field. Periodically, Dow dredged the ponds to remove the settled latex solids, which were dried and deposited in a landfill on Dow's property. This landfill was unlined and uncapped and was located on a higher elevation than Dow's plant. Over time, hazardous substances seeped from the unlined coagulation ponds and landfill into the ground and migrated underground onto the plaintiffs' property, which was lower in elevation than Dow's property. The plaintiffs first detected hazardous substances on their property in April 1987.

On January 26, 1990, the jury returned a verdict in favor of the plaintiffs for $450,000 in compensatory damages and $2 million in punitive damages. Judgment was entered on the verdict on January 29, 1990. With plaintiffs' consent, Ogletree then obtained an order from the district court extending the time for filing post-trial motions until March 8, 1990. On March 8, 1990, Dow filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial. The district court denied this motion on May 3, 1990.

Dow filed a notice of appeal to the Eleventh Circuit Court of Appeals on May 25, 1990. On April 19, 1991, the Eleventh Circuit dismissed Dow's appeal for failure to file a notice of appeal within 30 days after the entry of the original judgment. *Pinion v. Dow Chem., U.S.A.*, 928 F2d 1522 (11th Cir. 1991). The Eleventh Circuit held that the district court did not have the authority to extend the ten-day period for filing post-trial motions; therefore, the post-trial motions filed by Dow were untimely and did not toll the time for filing a notice of appeal. Id. at 1525-1526.

On October 28, 1993, Dow filed the present action against Ogletree in Fulton County Superior Court, alleging that Ogletree committed malpractice in various ways in its handling of the *Pinion* case. Both parties filed motions for partial summary judgment with respect to the issue of whether Ogletree may be liable for failure to timely file an appeal of the jury's verdict. The trial court granted Ogletree's motion for partial summary judgment and denied Dow's

motion. Dow appeals both of these rulings.

1. We have previously held that

> [i]n the context of a legal malpractice case in which the negligence alleged is the failure of an attorney to file an appeal, proximate cause may be established by showing that the appellate court would have reversed and that, upon remand to the lower court, the client would have obtained a more favorable result.

(Punctuation omitted.) *McMann,* supra at 280-281. See also *Jaraysi v. Soloway,* 215 Ga. App. 531, 532 (1) (451 SE2d 521) (1994). On appeal, Dow urges us to abandon the requirement that a plaintiff show it would have prevailed on appeal. Instead, Dow argues that the defendant in a legal malpractice case should bear the burden of proving that an appeal would have been unsuccessful.

It may be true, as Dow contends, that it is difficult for a plaintiff in a malpractice action to show how an appellate court would have ruled on a legal question. Nevertheless, we cannot ignore our Supreme Court's requirement that "[i]n a legal malpractice action, the plaintiff must establish . . . that [the attorney's] negligence was the proximate cause of damage to the plaintiff." (Punctuation omitted.) *Allen v. Lefkoff, Duncan, Grimes & Dermer, P.C.,* 265 Ga. 374, 375 (2) (a) (453 SE2d 719) (1995). Placing the burden on the defendant to show that an appeal would *not* have been successful would violate our Supreme Court's holding in *Lau's Corp.,* supra, that

> [a] defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.

Accordingly, we decline to place the burden on a defendant in a malpractice case to show that an appeal would not have been successful.

Alternatively, Dow urges that we adopt a "lost opportunity" standard, under which a plaintiff may sue its attorney for the lost opportunity to appeal, without regard to whether the appeal would have been successful. It is possible that the mere filing of an appeal, although meritless, could create uncertainty in the mind of the appellee and thus induce him to settle for a lesser amount, and that the failure to file such an appeal could damage the appellant by

depriving him of the opportunity to settle. However, it is highly questionable whether such speculative damages can properly serve as the basis for a malpractice action. See generally *McMann*, supra at 281 (1) ("Failure to file an appeal which would be unsuccessful on the merits or frivolous would not harm the losing litigant but instead would save the litigant time, money, and anguish."). Moreover, Dow's brief fails to mention any evidence showing that it was in fact damaged by such lost opportunity in this case. Accordingly, it is unnecessary to consider whether a "lost opportunity" analysis may be applicable in a legal malpractice case regarding the failure to file an appeal.

2. Dow next asserts that the trial court erred in refusing to allow it to present expert testimony from former United States District Court Judge Sidney O. Smith regarding Smith's opinion that an appeal to the Eleventh Circuit would likely have resulted in reversal of the $2 million punitive damages award. This assertion is without merit.

"The question of whether an appeal would have been successful is a question of law, exclusively within the province of judges." (Punctuation omitted.) *Hipple v. Brick*, 202 Ga. App. 571, 572 (1) (415 SE2d 182) (1992); see also *Fine & Block v. Evans*, 201 Ga. App. 294, 295 (1) (411 SE2d 73) (1991); *Jaraysi*, supra. "A matter of law is not the subject, or a proper subject, of expert testimony." 32 CJS Evidence, § 453, p. 92 (1964). It would be improper for the trial court, or for this Court, to rely upon the opinion of an "expert" as to the probable outcome of an appeal; rather, it is the duty of the trial court and this Court to apply the relevant law to determine whether the appeal would have been successful. See *Fine & Block*, supra (rejecting proposition that likelihood of success on appeal is matter to be decided by trier of fact with aid of expert testimony). Accordingly, the trial court did not err in refusing to allow opinion testimony regarding the likely outcome of an appeal.

3. Finally, Dow contends that, if Ogletree had properly appealed, the Eleventh Circuit would have reversed the denial of its motion for j.n.o.v. with respect to the award of punitive damages.[1] In considering this question, we apply the same standard of review that would have been applied by the Eleventh Circuit:

> On motions for . . . judgment notwithstanding the verdict, the Court should consider all the evidence — not just that evidence which supports the non-mover's case — but in the light and with all reasonable inferences most favorable to

---

[1] Dow does not contend that the Eleventh Circuit would have reversed the trial court's denial of its motion for a new trial. Accordingly, we do not address that issue.

the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion[ ] is proper. On the other hand, if there is substantial evidence opposed to the motion[ ], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[ ] should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motion[ ] for . . . judgment n. o. v. should not be decided by which side has the better of the case, nor should [it] be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

(Punctuation omitted.) *Watts v. Great A & P Tea Co.*, 842 F2d 307, 309-310 (11th Cir. 1988).

Because *Pinion* was a diversity action, the Eleventh Circuit would have applied Georgia law with respect to the availability of punitive damages. *Wammock v. Celotex Corp.*, 835 F2d 818, 820 (11th Cir. 1988). "In a tort action in which there are aggravating circumstances, in either the act or the intention, the jury may give additional damages to deter the wrongdoer from repeating the trespass or as compensation for the wounded feelings of the plaintiff." OCGA § 51-12-5 (a).[2]

It is well established that that language means such damages cannot be imposed in any case unless there is willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences. The latter expression (conscious indifference to consequences) relates to an intentional disregard of the rights of another, knowingly or willfully disregarding such rights.

---

[2] Because the evidence at trial showed that plaintiffs' cause of action accrued before July 1, 1997, the standard for awarding punitive damages is governed by OCGA § 51-12-5 (a) rather than by OCGA § 51-12-5.1. OCGA § 51-12-5 (b). See *Carter v. Myers*, 204 Ga. App. 498, 500-501 (3) (419 SE2d 747) (1992).

(Punctuation omitted.) *Read v. Benedict*, 200 Ga. App. 4, 6-7 (2) (406 SE2d 488) (1991).

> Whether the circumstances were sufficiently aggravating to authorize punitive damages is a jury question. Punitive damages may be recovered if the circumstances are such from which an *inference* of conscious indifference to the consequences and to the legal rights of others, or to the ordinary obligation of society might be drawn.

(Citation omitted; emphasis supplied.) *Mr. Transmission v. Thompson*, 173 Ga. App. 773, 775 (2) (328 SE2d 397) (1985).

Dr. Teitelbaum, a toxicologist, testified that the hazardous material on plaintiffs' property included carbon tetrachloride, 1,1-Dichloroethelene, methylene chloride, chloroform, and 1,1,2-Trichloroethane. Teitelbaum testified that, in his opinion, anyone who lived on the plaintiffs' property would have an increased risk for developing malignant and nonmalignant diseases such as cancer. According to Teitelbaum, the amount of these substances known to be present on plaintiffs' property was sufficient to cause such diseases, based on foreseeable exposure over many years. He testified that it was unlikely the problem would be solved by the remediation plan proposed by Dow, which he described as "a very minimal effort considering the nature of the site." In particular, he did not believe that enough test wells had been drilled on the plaintiffs' property to be able to prepare an adequate remediation plan. Although he acknowledged that the state Environmental Protection Division had approved Dow's remediation plan, he believed that it did not have adequate data or budget to do so.

Plaintiffs also presented the testimony of Dr. Richard Ellis, an environmental engineer with expertise in hazardous waste management. Ellis testified that, in his opinion, the high levels of contamination had arrived on the plaintiffs' property fairly recently, probably between 1984 and 1987, carried by groundwater. He noted that, because the landfill and coagulation ponds were built on a higher elevation than the plaintiffs' property, and water naturally flows downhill, it was foreseeable that contamination would migrate toward the plaintiffs' property.

Dr. Ellis testified that, in the 1960s and 1970s, the technology was available to line coagulation ponds to prevent leakage. Indeed, he testified that Dow manufactured and marketed a liner material at the time, although it did not use it for its ponds. Although Ellis admitted that the standard industry practice at the time was to use unlined ponds, he testified that the state-of-the-art practice was to use lined ponds. He testified that using liners would not have pre-

vented Dow from dredging the ponds to remove the solid latex.

Dr. Ellis also testified that Dow should have drilled simple monitoring wells next to the coagulation ponds, which would have detected the leakage from the coagulation ponds. He testified that this was a simple and well-known technology at the time the ponds were in operation. Ellis testified that, in his opinion, Dow's failure to install monitoring wells near the unlined ponds was unreasonable and not prudent.

Dr. Ellis also testified that the remediation plan prepared by Dow did not represent the best available technology and would allow contaminated groundwater to continue flowing onto the plaintiffs' property. He noted that, at the time of trial, the landfill remained unlined and uncapped, allowing rainwater to percolate through the landfill and carry hazardous material into the groundwater, where it would proceed onto the plaintiffs' property. Dow's expert, Dr. Thomas Kwader, testified that "the [landfill] area is not a concern, an immediate concern at this time. We have a more, a higher priority concern. . . . It is not as important as the contamination. We have migration off-site." He admitted that nothing had been done to stop the seepage of 1,1-Dichloroethelene from the landfill. He also admitted that no deep wells had been drilled on the plaintiffs' property to test whether the deep aquifers there had been contaminated, although "[i]f they were contaminated, it would be important." He said no samples had been taken from plaintiffs' property since August 1987. He admitted that he could not guarantee the property would be cleaned up 50 percent in 50 years.

Catherine Holmes, Dow's plant manager at the time of trial, testified that there were no records showing exactly what substances had been stored in the coagulation ponds. She denied that Dow placed hazardous wastes in the pond, admitting that that would violate federal law. She said that the wastewater from the latex manufacturing process did not constitute hazardous waste, as defined under federal or state law, and that there was a distinction between hazardous materials and hazardous waste. However, Dow's expert, Dr. Kwader, stated as follows in his deposition, which was admitted at trial: "Q. Did you come to a conclusion that they were storing hazardous waste? A. I wasn't provided any chemical data of what was in the ponds, so no, I had not reached that conclusion at the second visit. Q. Have you reached that conclusion now? A. I believe there were hazardous wastes stored in these coagulation ponds." Another of Dow's experts, Dr. Christopher Teaf, testified that the substances found on plaintiffs' property — 1,1-Dichloroethelene, chloroform, carbon tetrachloride, and methylene chloride — could be classified as hazardous wastes in certain circumstances. Plaintiff's expert, Dr. Ellis, testified that 1,1-Dichloroethelene, carbon tetrachloride, and

methylene chloride were classified as hazardous wastes by the Environmental Protection Agency.

Dr. Kwader admitted in his deposition that "[i]t would not be unexpected" to have seepage from unlined coagulation ponds. He admitted that, in the early 1980s, unlined ponds would not have been his first choice for the purpose they were being used by Dow. Rather, he would have recommended using an artificial membrane liner. In addition, he testified that "normally what we would do is to install some type of detection system underneath the pond to see if it were leaking." Such a detection system would consist of a horizontal well or collection system. Although Kwader said that such systems were not widely known in 1980, they were known by some people, including himself.

Another of Dow's expert witnesses, Edwin Barnhart, an environmental engineer, testified that, "[i]f I had an old plant from about 1978 or '79 on, there was information around that would have led me to use air flotation" rather than coagulation ponds in the latex manufacturing process. He explained that air flotation involves using a mixture of air and water to cause particles to rise to the surface. This process would allow hazardous materials to be removed from wastewater "in a matter of an hour or two rather than letting it sit there for a long time." He testified that "[b]y the late '70's or early '80's, I certainly would have [used air flotation]." He also said that the technology was available in the 1970s and 1980s to build monitoring wells next to coagulation ponds, but said that this would detect only large quantities of material being released and would not be effective for detecting small quantities. Barnhart stated that he did not ask anyone at Dow why they did not install monitoring wells. Catherine Holmes testified that in the early 1980s Dow decided to phase out the coagulation ponds and replace them with a dissolved air flotation system. The coagulation ponds were ultimately phased out in 1986. She had no idea why an air flotation system was not installed in the 1970s.

Although we cannot say that the evidence against Dow was overwhelming with respect to punitive damages, we believe the Eleventh Circuit would have affirmed the jury's award of such damages. There was evidence that, in the 1960s and 1970s, the technology was available to use lined coagulation ponds, and that Dow itself manufactured and marketed a liner. Although Dow claimed that use of a liner would have interfered with its ability to dredge the ponds, this position was contradicted by the testimony of Dr. Ellis. One of Dow's own experts admitted that lined ponds would have been his first choice at least by the early 1980s. Alternatively, at least by the late 1970s, Dow could have begun using air flotation technology to remove hazardous substances from its wastewater. Although the standard

industry practice at the time was to use unlined coagulation ponds, the jury could have concluded that, as an industry leader with access to current technology, Dow should have used state-of-the-art technology. Moreover, there was evidence that Dow could have installed simple monitoring wells to detect any leakage from its ponds. Although Dow claimed that such wells would have been ineffective in detecting low levels of leakage, that claim was disputed. Given (1) the fact that the coagulation ponds and landfill were situated near to and on a higher elevation than plaintiffs' property, thus making it foreseeable that any contamination would flow downhill toward plaintiffs' property, (2) the fact that Dow's expert admitted that it was not unforeseeable that there would be leakage from unlined ponds, and (3) the possible consequences to plaintiffs of contamination, the jury could have concluded that Dow's failure either to use better technology or to install a monitoring system demonstrated a conscious disregard of the consequences to plaintiffs.[3]

The jury could also have concluded that Dow did not take adequate measures to remediate the contamination. Although the Environmental Protection Division concluded that Dow's plan was adequate, plaintiffs' expert testified that the data collected by Dow were inadequate to evaluate the plan. He also characterized Dow's remediation plan as "a very minimal effort." Although this evidence in isolation might not have been sufficient to support an award of punitive damages, the jury could have considered it in connection with the evidence regarding Dow's failure to use adequate technology to prevent leakage in the first place and concluded that the combined weight of the evidence supported an inference of conscious indifference to consequences.

It was not necessary for plaintiffs to show intentional misconduct on the part of Dow in order to recover punitive damages; it was sufficient to present evidence supporting an *inference* of conscious indifference. *Mr. Transmission*, supra. It is not our function, or the function of the Eleventh Circuit, to consider " 'which side has the better of the case.' " *Watts*, supra, 842 F2d at 310. Viewing all of the evidence, as we believe the Eleventh Circuit would have done, we believe that the question of Dow's conscious indifference to consequences was one as to which " 'reasonable and fair-minded men in the exercise of impartial judgment might reach different conclu-

---

[3] In its brief, Dow argues that its failure to install monitoring wells "is relevant to the issue of punitive damages only if Dow had reason to suspect that the wastewater would leak through the clay soil it believed in good faith to be impermeable or that a leak would contain dangerous contaminants. There was *no* such evidence." This argument ignores the testimony of Dow's own expert, Dr. Kwader, admitting that it was not unexpected that the unlined ponds would leak.

sions.'" Id. at 309. Accordingly, the issue was within the province of the jury, and it is likely that the Eleventh Circuit would not have reversed the award of punitive damages. The trial court thus properly granted Ogletree's motion for partial summary judgment and denied Dow's motion.

*Judgment affirmed. Pope, P. J., and Beasley, P. J., concur.*

DECIDED MARCH 16, 1999 — 

*Keegan Federal & Associates, R. Keegan Federal, Jr., John P. Marinan,* for appellant.

*Hawkins & Parnell, J. Bruce Welch, Robert R. Elarbee,* for appellee.