A01A2276. JOHNSON v. AMERICAN NATIONAL RED CROSS et al.
(569 SE2d 242)

MIKELL, Judge.

Bernice Mantooth brought the underlying action against the American Red Cross (the "Red Cross"), General Hospitals of Galen, Inc. d/b/a Cartersville Medical Center ("CMC"), two individual doctors, and two nurses, alleging claims of professional negligence, ordinary negligence, and negligent and intentional infliction of emotional distress. Mantooth filed suit after she was given a transfusion of blood from a donor who had lived in a region of Africa where a rare undetectable strain of HIV was known to exist. After Mantooth's death on May 23, 2001, Lester Johnson, the executor of her estate (the "Estate"), continued to pursue her claims. Presently, the Estate appeals the trial court's grant of the Red Cross's motion to open default and motion for summary judgment, and the grant of a partial summary judgment in favor of CMC. We affirm.

The record shows that prior to her death at age 75, Mantooth suffered from serious medical conditions including anemia, angina, breast cancer, heart disease, lung cancer, asthmatic bronchitis, diabetes, kidney failure, and pneumonia. She never tested positive for HIV or the AIDS virus.

The incident giving rise to Mantooth's underlying action took place on August 29, 1998, when she went to the CMC emergency

room complaining of chest pain and shortness of breath. After an initial examination by the attending emergency room physician, Mantooth was examined by Dr. David Kim, who was on call for Mantooth's private internist, Dr. Sam Howell. Mantooth was diagnosed with exacerbation of emphysema. Given her current condition and medical history, Dr. Kim ordered that she receive two units of blood.

Fifteen minutes after the transfusion began, Mantooth complained of severe pain in the left side of her chest that radiated down her left shoulder and arm and into her back. Dr. Kim transferred Mantooth to the intensive care unit, where she was treated for asthma, congestive heart failure, and chest pain. When her condition stabilized, Mantooth was transferred to Crawford Long Hospital, where she was discharged several days later. Mantooth was subsequently diagnosed with lung cancer.

On October 28, 1998, the Red Cross notified CMC that it had supplied the hospital with blood that did not meet its standards. As a precaution, the Red Cross normally did not allow people who had lived in Central Africa for longer than 12 months to donate blood. The Red Cross became aware that the blood at issue had come from a donor who had lived for 13 months in a region of Africa where a rare undetectable strain of HIV known as "Group O" had been found. The donor did not test positive for HIV in the five years between the time he lived in Africa and when he donated blood, nor was there any reason, other than his stay in Central Africa, to believe that he had been exposed to the virus. CMC determined that the blood had been given to Mantooth and notified her physician, Dr. Howell, on November 4, 1998.

On or about December 8, 1998, Dr. Howell informed Mantooth that the blood used in the August transfusion should not have been accepted by the Red Cross. He arranged for Mantooth to undergo an HIV test on December 9, and the results were negative. Mantooth had additional HIV tests in March and April 1999, and those results were negative as well. On December 24, 1998, the Red Cross sent Mantooth a letter in which it explained that the likelihood that the blood she received was tainted was "extremely remote."

Mantooth was very upset about the possibility that she had been exposed to an undetectable strain of HIV and claimed that she lived in fear that she had the virus and would pass it to her family members. She did not seek medical treatment for her severe emotional distress, nor did she seek treatment for the physical damage allegedly caused by the transfusion. Mantooth conceded that she did not incur any medical expenses as a direct result of the transfusion.

Mantooth filed suit on August 27, 1999, alleging that Dr. Kim and Dr. Howell were negligent and that CMC was vicariously liable.

She also included claims of negligence and negligent and intentional infliction of emotional distress against the Red Cross. The Red Cross was served with the complaint on September 3, 1999; however, due to a misunderstanding in the office of the General Counsel, the Risk Management Division of the organization did not receive the complaint until November 1. The Red Cross moved to open the default on November 18, 1999, and the trial court subsequently granted the motion.

CMC filed a motion for partial summary judgment on September 15, 2000, and the trial court granted it, concluding that the hospital could not be held vicariously liable for the doctors' conduct, because they were independent contractors and not employees of CMC. The court also granted summary judgment to the Red Cross based on the conclusion that Mantooth failed to present any evidence that she was actually exposed to HIV, and thus there was no basis for her claims of negligence or infliction of emotional distress.

1. First, the Estate argues that the trial court erred in granting the Red Cross's motion to open default. OCGA § 9-11-55 (b) allows a default to be opened on one of three grounds if four conditions are met. The three grounds are: (1) providential cause, (2) excusable neglect, and (3) proper case. The four conditions are: (1) a showing made under oath, (2) an offer to plead instanter, (3) announcement of ready to proceed with trial, and (4) setting up a meritorious defense. *Ford v. St. Francis Hosp.*, 227 Ga. App. 823, 824-825 (1) (490 SE2d 415) (1997). "Whether to open the default on one of the three grounds rests within the discretion of the trial judge." (Citation and punctuation omitted.) Id. at 825 (1). "The rule permitting opening of default is remedial in nature and should be liberally applied, for default judgment is a drastic sanction that should be invoked only in extreme situations. Whenever possible cases should be decided on their merits for default judgment is not favored in law." (Punctuation and footnote omitted.) *Kaylor v. Atwell*, 251 Ga. App. 270, 271 (1) (553 SE2d 868) (2001). See also *Exxon Corp. v. Thomason*, 269 Ga. 761, 762 (2) (504 SE2d 676) (1998); *Patel v. Gupta*, 234 Ga. App. 441, 443 (1) (507 SE2d 763) (1998).

Contrary to the Estate's argument, we conclude that the four conditions for opening default were met. First, the Red Cross provided the sworn affidavit of Randy Jouben, a corporate claims associate in the Risk Management Division of the Red Cross, to explain the delay in responding to Mantooth's complaint.[1] Second, the Red Cross

---

[1] The Estate contends that one paragraph of the affidavit contains inadmissible hearsay. It does not appear from the record that the trial court ruled on Mantooth's motion to strike paragraph 6 of the affidavit. However, even in the absence of that paragraph, Jouben's affidavit is sufficient to meet the first condition for opening default.

offered to plead instanter and attached an answer to its motion to open default. Third, it announced that it was ready to proceed to trial. Fourth, the Red Cross set up a meritorious defense through its answer. This condition does not require a defendant to show that it will "completely defeat plaintiff's claim"; rather, the defendant must demonstrate that "if relief from default is granted, the outcome of the suit may be different from the result if the default stands." *Exxon Corp.*, supra at 761 (1). The Red Cross presented defenses including failure to state a claim upon which relief can be granted, assumption of the risk, and Mantooth's consent to the blood transfusion. "Although these defenses were not set out in great factual detail, they are sufficient to satisfy OCGA § 9-11-55 (b)." *Ford*, supra at 825 (1). Having concluded that the Red Cross met the four requisite conditions, we now must determine if one of the three grounds for opening default existed.

The court's order does not specify the ground on which it relied in opening the default; therefore, we will presume the court's decision was based on the "proper case" ground. *Ford*, supra at 826 (1). This ground is broader than the other two, and we will not interfere unless the court's discretion was manifestly abused. *Miller v. Tranakos*, 198 Ga. App. 668, 670 (1) (402 SE2d 772) (1991). See also *Ford*, supra.

Upon reviewing the record, we conclude that the trial court did not manifestly abuse its discretion in opening the default. Jouben's affidavit shows that the complaint was served on the Medical Director of the Regional Chapter of the Red Cross in Atlanta; that the Risk Management Division did not receive the complaint until November 1, 1999; that there was a misunderstanding in the office of the General Counsel which led the Red Cross to believe that the complaint was being handled properly; and that immediately upon receiving the complaint, the Risk Management Division forwarded it to the third-party administrator for the Red Cross, who sent it to outside counsel. Additionally, there is no evidence that Mantooth was prejudiced by the opening of default. See *Ford*, supra at 826.

The Estate's reliance on *Azarat Marketing Group v. Dept. of Administrative Affairs*, 245 Ga. App. 256 (537 SE2d 99) (2000), and *Ellis v. Five Star Dodge*, 242 Ga. App. 474 (529 SE2d 904) (2000), is misplaced. Those cases involved the excusable neglect ground for opening default, while the case sub judice involves the proper case ground. In *Ellis*, supra, we held that the trial court abused its discretion in opening default on the basis of excusable neglect. But as we recognized in *Miller*, supra, a trial judge is afforded broader discretion in cases involving the proper case ground than in those in which the court bases its decision on excusable neglect. Additionally, in *Azarat Marketing*, we affirmed the court's refusal to open default, but

we did not hold that it would have been an abuse of discretion for the court to open default. In fact, we recognized that "the trial court . . . could have found excusable neglect, but did not." Id. at 259 (2).

Similarly, *First Union Nat. Bank &c. v. Floyd*, 198 Ga. App. 99 (400 SE2d 393) (1990), is also distinguishable from the case sub judice. In *First Union*, as in *Azarat Marketing*, we held that the trial court did not err in refusing to open default under the providential cause or excusable neglect grounds. Again, we recognized that "[w]e cannot hold that as a matter of law the trial judge in this case could not have found, in his broad discretion, that the explanation offered by defendant nevertheless made a 'proper case' for opening the default." *First Union*, supra at 101 (2). At most the cases cited by the Estate show that it might not have been an abuse of discretion if the court had denied the Red Cross's motion or that the Red Cross may not have satisfied the providential cause or excusable neglect standards. However, these cases do not affect our consideration of the trial court's decision on the proper case ground. Accordingly, the trial court did not abuse its discretion in finding that a proper case had been made for opening default and in granting the Red Cross's motion.

2. Next, the Estate assigns error to the court's grant of summary judgment in favor of the Red Cross. The court found that Mantooth failed to present evidence of any recoverable damages; therefore, the Red Cross was entitled to summary judgment on her claims of ordinary and professional negligence and negligent infliction of emotional distress. We find no error and affirm.

Summary judgment is proper when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). To obtain summary judgment, a defendant need not produce any evidence but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant. *Supchak v. Pruitt*, 232 Ga. App. 680, 682 (1) (503 SE2d 581) (1998).

We agree with the trial court that Mantooth's failure to demonstrate recoverable damages is fatal to all of her claims of negligence against the Red Cross. In order to maintain a cause of action for ordinary or professional negligence, a plaintiff must prove the following elements: (1) a legal duty to conform to a standard of conduct; (2) a breach of this duty; (3) a causal connection between the conduct and the resulting injury; and (4) damage to the plaintiff. *Dow Chem. Co. v. Ogletree, Deakins, Nash &c.*, 237 Ga. App. 27 (514 SE2d 836) (1999); *Grant v. Perimeter Mall Mgmt. Corp.*, 215 Ga. App. 652, 653

(452 SE2d 153) (1994). "If the defendant is successful in piercing plaintiff's pleadings with regard to one essential element, the defendant is entitled to summary judgment regardless of whether issues of fact remain with regard to the other elements." *Grant*, supra.

Even assuming, arguendo, that the Red Cross breached a duty by failing to follow its own standards concerning blood donors who have lived in certain regions of Africa, Mantooth could not recover without demonstrating damage proximately caused by the Red Cross's breach. *Ridgeview Institute v. Handley*, 224 Ga. App. 533, 536 (3) (481 SE2d 531) (1997). In her complaint, Mantooth stated that her damages attributable to the actions of the Red Cross were emotional distress caused by the fear of contracting HIV and the AIDS virus, pain and suffering, and medical expenses. Mantooth deposed that she was very upset about the possibility that she had been exposed to HIV and that she lived in fear that she had the virus. But she did not seek medical treatment for her emotional distress, nor did she seek treatment for the physical damage allegedly caused by the transfusion. Mantooth conceded that she did not incur any medical expenses as a direct result of the transfusion. Furthermore, there was no medical evidence that the Red Cross caused the physical pain Mantooth suffered during the blood transfusion. Thus, the only alleged damage supported by the record is Mantooth's emotional distress resulting from her fear that she had been exposed to HIV.

However, in *Russaw v. Martin*, 221 Ga. App. 683, 686 (1) (472 SE2d 508) (1996), we held that a plaintiff must prove actual exposure in order to recover for the fear of being exposed to HIV and/or the AIDS virus. "To allow recovery for emotional injuries and mental anguish, without any proof whatsoever that [the plaintiff] was actually exposed to HIV . . . is per se unreasonable." Id. Contrary to the Estate's argument, the trial court's application of the *Russaw* decision to the case sub judice was not erroneous. In *Russaw*, as in the present case, the plaintiff feared contracting HIV after an allegedly negligent event. Further, the plaintiff in *Russaw*, like Mantooth, was unable to demonstrate actual exposure to HIV. "Because the [plaintiff] offered no evidence of actual exposure to HIV or AIDS . . . and no evidence of a channel of communication of disease, we hold that [her] recovery for fear and mental anguish is per se unreasonable as a matter of law." Id. at 687 (1). See also *McQuaig v. McLaughlin*, 211 Ga. App. 723, 727 (2) (440 SE2d 499) (1994) (damages for mental distress and fear of AIDS associated with blood transfusion were not recoverable absent a showing of physical injury).

The Estate argues that Mantooth should not have been required to demonstrate actual exposure, because the "Group O" strain of HIV is undetectable by known tests. We reject this argument, because the Red Cross can never be completely sure that the blood it supplies is

free of undetectable diseases. In *McAllister v. American Nat. Red Cross*, 240 Ga. 246, 249 (2) (240 SE2d 247) (1977), the Supreme Court exempted suppliers of blood from being held strictly liable under a product liability theory. The Supreme Court cited the case of *Heirs of Fruge v. Blood Svcs.*, 506 F2d 841, 844-845 (II) (5th Cir. 1975) (Louisiana law), for the proposition that "the obvious and overwhelming need for blood and blood products to be used in transfusions and in surgery" could be met only if suppliers were not threatened by "crippling legal liability for a very small but — according to the majority of medical authorities — hard to avoid risk that their blood carried indetectable [sic] viral hepatitis." Essentially, our Supreme Court recognized that blood banks could not survive if they were subject to liability for a blood recipient's fear of catching an undetectable disease in the absence of a full showing of negligence. *McAllister*, supra.

It follows that in the case sub judice, the trial court did not err in refusing to exempt Mantooth from the legal requirement of demonstrating actual exposure to HIV in order to recover damages for emotional distress resulting from the Red Cross's negligence. See *Russaw*, supra. Because Mantooth could not meet this requirement, the trial court properly granted summary judgment on her negligence claims against the Red Cross.

3. Furthermore, the trial court properly granted summary judgment in favor of the Red Cross on Mantooth's claim of intentional infliction of emotional distress. The four elements which must be proved in order to sustain a claim of intentional infliction of emotional distress are the following: (1) the conduct must be intentional or reckless; (2) it must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Northside Hosp. v. Ruotanen*, 246 Ga. App. 433, 435 (541 SE2d 66) (2000).

We do not doubt that the plaintiff has satisfied the third and fourth elements. But there is no evidence that the Red Cross intended to inflict emotional pain on Mantooth. Nor was its conduct reckless. An employee failed to notice that a donor had, five years prior to his donating blood, stayed for one month longer in Central Africa than the allowable twelve months. The consequences of the employee's omission could have been horrible. But his or her act was negligence and not an intentional infliction of emotional distress. Accordingly, the trial court properly granted summary judgment in favor of the Red Cross.

4. Finally, the Estate argues that the trial court erred in granting partial summary judgment to CMC. Mantooth asserted claims of professional negligence against Dr. Kim and Dr. Howell. She alleged that Dr. Kim was negligent in ordering that she receive a blood trans-

fusion too quickly and in failing to stop the transfusion immediately upon learning of the pain she experienced, and that Dr. Howell was negligent in his treatment of her lung cancer and in failing to promptly notify her of the potentially tainted blood she received. Mantooth sought to hold CMC vicariously liable for the doctors' conduct. CMC successfully moved for partial summary judgment on the issue of vicarious liability. We conclude that the trial court did not err.

First, it is clear from the record that Dr. Kim and Dr. Howell were not employees of CMC; rather, the hospital merely granted them active medical staff privileges. "The true test of whether the relationship is one of employer-employee . . . is whether the employer . . . assumes the right to control the time, manner and method of executing the work." (Punctuation omitted.) *Holmes v. Univ. Health Svc.*, 205 Ga. App. 602, 603 (423 SE2d 281) (1992), citing *Allrid v. Emory Univ.*, 249 Ga. 35, 39-40 (285 SE2d 521) (1982). Here, the doctors maintained private medical practices during the relevant time. CMC did not compensate Dr. Kim and Dr. Howell for medical services performed at the hospital, nor did it reserve the right to control the time, manner, or method of their patient care.

Contrary to the Estate's argument, the recruiting agreement between CMC and Dr. Kim did not transform Dr. Kim into an employee of the hospital. That agreement did not provide a salary to the doctor; rather, it referred to a loan from CMC to Dr. Kim to finance his practice. The agreement specifically provided that "Physician shall employ his/her own means and methods and exercise his/her own independent medical judgment in his/her practice of medicine" and that "Physician is and shall be an independent contractor and not a servant, agent, or employee of Hospital." Additionally, the agreement expressly stated that Dr. Kim was not under the control or direction of CMC.

Likewise, Mantooth was unable to establish that Dr. Howell was an employee of CMC. The Estate conceded in its appellate brief that Dr. Howell was Mantooth's "personal physician." Further, the record shows that Mantooth went to Dr. Howell's private office to consult with him. Finally, Mantooth admitted in her deposition that she had no evidence that Dr. Kim or Dr. Howell was an employee of CMC.

We also conclude that there was no evidence to hold CMC vicariously liable for the doctors' conduct based on an apparent agency theory. "Under the doctrine of apparent agency, a hospital may be liable for the actions of a doctor who is an independent contractor when (1) the hospital holds out the doctor as its agent, and (2) the patient's justifiable reliance on that holding out leads to injury." *North Ga. Med. Center v. Stokes*, 238 Ga. App. 60 (517 SE2d 93) (1999). There is no evidence of either element of apparent agency in the case sub

judice. In fact, the consent form signed by Mantooth on August 28, 1998, explicitly stated that she understood that all physicians furnishing services to her at CMC were "independent contractors and [were] not employees or agents of the hospital." Thus, the evidence showed that CMC did not hold out the doctors as its agents. Accordingly, the trial court properly found that CMC could not be held vicariously liable for the conduct of Dr. Kim and Dr. Howell and did not err in granting partial summary judgment.

*Judgment affirmed. Blackburn, C. J., and Pope, P. J., concur.*

DECIDED FEBRUARY 6, 2002 — 

*Bird & Associates, Wendell R. Bird, Richard L. Brittain*, for appellant.

*Weinberg, Wheeler, Hudgins, Gunn & Dial, Alan M. Maxwell, Howard J. Russell, Nelson, Mullins, Riley & Scarborough, Scott P. Hilsen, Jeffrey C. Baxter, Lance P. McMillian, Brinson, Askew, Berry, Seigler, Richardson & Davis, Robert L. Berry, Jr., Stephen B. Moseley*, for appellees.