A03A0664. RODDY et al. v. TANNER MEDICAL CENTER, INC.
(585 SE2d 175)

MIKELL, Judge.

Sharon and Kevin Roddy appeal the trial court's grant of summary judgment to Tanner Medical Center, Inc. ("Tanner") in their action alleging intentional infliction of emotional distress. For the reasons set forth below, we affirm.

Summary judgment is proper when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). To obtain summary judgment, a defendant need not produce any evidence but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). Our review of a grant of summary judgment is de novo, and we view the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmovant. *Supchak v. Pruitt*, 232 Ga. App. 680, 682 (1) (503 SE2d 581) (1998).[1]

---

[1] *Johnson v. American Nat. Red Cross*, 253 Ga. App. 587, 591 (2) (569 SE2d 242) (2002).

So viewed, the evidence shows that Mrs. Roddy had a miscarriage on February 2, 2000. She was ten and a half weeks pregnant. The Roddys had been trying to have a baby for seven years. Mrs. Roddy testified that she started having cramps when she awoke that morning. Mr. Roddy drove her to Tanner, and she bled heavily in the car. Mrs. Roddy testified that about five minutes away from the house she "felt something big pass, and the blood just kept getting heavier." By the time she arrived at the emergency room ("ER"), she was saturated with blood from her chest to her shoes, even though she had placed a towel between her legs. Mrs. Roddy informed the ER nurse that she had passed something big, and the nurse asked if she had brought it. Mrs. Roddy replied that whatever she passed was still in her pants.

Meanwhile, Mrs. Roddy was bleeding onto the floor, so the nurse put her in a room. The nurse instructed Mrs. Roddy to remove her clothing, and then sat her down on the table so she would not become dizzy and faint. Mrs. Roddy noticed several large blood clots on her legs, and the nurse removed them, placed them in a bowl, and stated that she would give them to the doctor. Mrs. Roddy then testified that the nurse said "she was going to have to go take what she could out of my clothes. So I sat there while she did that." The nurse then asked Mrs. Roddy whether she wanted her clothes thrown away, and Mrs. Roddy replied that she did not. The nurse put the clothing in a white plastic bag under Mrs. Roddy's bed. When she was transferred to a room, the bag was placed in the closet.

In the room, Mrs. Roddy continued to pass large blood clots, so her physician performed a D&C. She was discharged the same day and took her bag of bloody clothing home. Restless, Mrs. Roddy decided to do laundry to occupy herself. She testified that when she removed her pants from the bag, she heard a thud on the floor. It was her intact fetus, lying inside the fetal sac.

Mr. Roddy testified that he had never heard his wife scream the way that she did when she saw that fetus on the floor. According to Mr. Roddy, his wife still wakes up screaming in the middle of the night, and she suffers from post-traumatic stress disorder. Mr. Roddy testified that his wife's hair is falling out; that she no longer likes to be around people; that they both continue to have panic attacks; and that the incident has strained their marriage.

After viewing the fetus, Mr. Roddy called the hospital. He spoke with an ER nurse, who allegedly treated him rudely. Mr. Roddy called back and spoke with a labor and delivery nurse. She was very apologetic and arranged for an obstetrician at the hospital, Dr. Jewell, to contact Mr. Roddy. Dr. Jewell advised Mr. Roddy to put the fetus in a bowl, place it in the refrigerator, and take it to their physician the following morning, which they did. According to Mrs. Roddy,

Dr. Jewell offered for the Roddys to bring in the fetus to the hospital that evening, but her husband said no.

The Roddys claim that Tanner intentionally, with wilful or wanton conduct, or with reckless disregard for the consequences of its actions, inflicted emotional distress upon them because the ER nurses failed to locate and remove the fetus from Mrs. Roddy's pants before placing her clothing in a plastic bag. In granting summary judgment to Tanner, the trial court ruled that the Roddys failed to create a jury issue as to whether Tanner's actions were reckless or intentional.

> The four elements which must be proved in order to sustain a claim of intentional infliction of emotional distress are: (1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe.[2]

The Roddys have presented sufficient evidence to survive summary judgment on the third and fourth elements. They suffered a horrific shock, and consequent emotional distress, caused by the ER nurse's failure to locate and retain the fetus. But we find the evidence insufficient to present a jury issue as to the first element. "[D]amages may be recovered for mere nervous shock or fright . . . , where the act causing such shock or fright was committed by the defendant deliberately, maliciously, or wantonly, through an utter disregard of consequences."[3] Mrs. Roddy's deposition testimony suggests that the ER nurse made some attempt to look through her clothes before placing them in a bag. The Roddys assert in their brief that "hospital workers searched Mrs. Roddy's clothing, removed some blood clots, but failed to locate the fetus in the clothing." The fact that the fetus was not located might be evidence of negligence in the search. But that negligence, without more, is not evidence of "a reckless disregard of the rights of others, equivalent to an intentional tort."[4]

Contrary to the Roddys' argument, *McCoy v. Ga. Baptist Hosp.*[5] does not require a different result. In *McCoy*, the mother's baby was stillborn, and the parents executed a release authorizing the hospital to dispose of the baby and relinquishing all claims to the child's body.

[2] (Citation omitted.) *Northside Hosp. v. Ruotanen*, 246 Ga. App. 433, 435 (541 SE2d 66) (2000).

[3] (Citation and punctuation omitted.) *Pollard v. Phelps*, 56 Ga. App. 408, 420 (1) (193 SE 102) (1937).

[4] (Punctuation omitted.) *McCoy v. Ga. Baptist Hosp.*, 167 Ga. App. 495, 498 (306 SE2d 746) (1983), citing *Pollard*, supra at 408 (1).

[5] Supra.

Subsequently, the mother developed emotional problems of which the hospital was aware. A month after the birth, a nurse employed by the mother's physician telephoned the hospital inquiring as to the disposition of the infant's body. Instead of calling the physician's office, a hospital employee called the mother and informed her that the body was being stored in a freezer and that she should "come and get it."[6] In reversing the grant of summary judgment to the hospital on the claim for intentional infliction of emotional distress, this Court held that a question of fact existed as to whether the hospital's telephone call was made in reckless disregard of the consequences to the mother.[7] The facts paint a different picture in the instant case. There is no evidence that the ER nurse was aware that she had placed Mrs. Roddy's fetus in her bag of clothing. Rather, the evidence indicated that she made some attempt to find the fetus. A case in which a hospital disregarded a mother's emotional health and intentionally called her to insist that she retrieve her stillborn baby is not factually apposite to the case at bar.

The Roddys' reliance on *Canberg v. City of Toccoa*[8] is similarly misplaced. In that case, city firefighters refused to fight a house fire because they did not believe that the home was within the city limits.[9] When the homeowners pointed to the city garbage can in their driveway, the assistant fire chief accused the homeowners of attempting to defraud the city.[10] The home burned to the ground. We reversed the grant of summary judgment to the city on the homeowners' claim of intentional infliction of emotional distress, finding the city's actions "sufficiently outrageous and egregious" to take to a jury.[11] The facts on which we relied in *Canberg* are not analogous to those in the instant case. There is no evidence that a hospital employee refused to look through Mrs. Roddy's clothing, in contrast to the evidence in *Canberg* that the city fire department refused to fight the fire. *Canberg*, therefore, is not controlling.

The facts of this case would move any court to be sympathetic with the Roddys. But the tort of "intentional infliction of emotional distress," as its name implies, is reserved in Georgia for instances in which a defendant intended to harm the plaintiff, or for those rare occasions in which the evidence shows such a reckless disregard of the rights of others as to be equivalent to an intentional tort. The evidence in this case does not support an inference that the hospital

---

[6] (Punctuation omitted.) Id. at 499 (2).
[7] Id.
[8] 255 Ga. App. 890 (567 SE2d 21) (2002).
[9] Id. at 891.
[10] Id. at 892 (2).
[11] (Punctuation and footnote omitted.) Id.

employees acted with "reckless disregard" of the Roddys' rights. The trial court was correct to grant summary judgment.

*Judgment affirmed. Johnson, P. J., and Eldridge, J., concur.*

DECIDED JULY 8, 2003.

*Smith, Diment & Conerly, Richard A. Diment, Charles S. Conerly*, for appellants.

*Tisinger, Tisinger, Vance & Greer, Richard G. Tisinger, Jr., Kenneth B. Crawford*, for appellee.