A02A1258. NELSON v. GLYNN-BRUNSWICK HOSPITAL AUTHORITY et al.
(571 SE2d 557)

BLACKBURN, Chief Judge.

Dr. William H. Nelson, plaintiff in the underlying tort action, appeals the trial court's grant of summary judgment to the Glynn-Brunswick Hospital Authority d/b/a Southeast Georgia Regional Medical Center (hereinafter Southeast), Quorum Health Services Center, Quorum Health Services, Inc., and E. Berton Whitaker, defendants below. Nelson contends that there were genuine issues of fact in his claims of (1) defamation, (2) invasion of privacy, (3) intentional infliction of emotional distress, (4) violation of OCGA § 24-9-40, and (5) punitive damages. For the following reasons, we affirm.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

*Matjoulis v. Integon Gen. Ins. Corp.*[1]

Viewing the evidence in this light, the record shows that Dr. Nelson was an employee of Sterling Miami, Inc. (hereinafter Sterling) and pursuant to a contract between Sterling and Southeast, he

---

[1] *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

served as the medical director of the emergency department at the hospital. Prior to becoming the medical director, Nelson, as a physician, had obtained patient treatment privileges at the hospital and had agreed to abide by its policies and procedures.

On March 18, 1997, during treatment of a patient, Dr. Nelson received a suture needle stick, and, following hospital protocols, his blood was tested for certain viruses. The lab results were positive for hepatitis C virus (HCV) antibodies. The patient on whom the suture needle had been used tested negative for HCV. Dr. Nelson's results were confirmed by blood drawn by Dr. Grubb's office at Nelson's request. No further tests have been conducted. At the time of Dr. Nelson's blood test, guidelines of the U. S. Department of Health & Human Services and the Centers for Disease Control stated that individual test results are not sufficiently reliable to be conclusive proof of current infectiousness or whether the infection is recent or old. These guidelines further indicated that the great majority of persons infected with the disease develop a chronic infection which may result in liver disease and failure.

The results of Dr. Nelson's hospital blood test were orally relayed from the lab technician to the lab director, who contacted the hospital administrator, appellee E. Berton Whitaker. Together, they discussed with the director of nursing the seriousness of the results. The hospital administrator then telephoned Dr. Nelson, who advised that he knew that the test results would come back positive, apparently because of a ten-year-old incident.

The next morning, the hospital administrator consulted the hospital's legal counsel, and they decided to assemble an ad hoc group of physicians to discuss the situation. Prior to the meeting of this group, steps were taken to ensure that Dr. Nelson's test records would not include his name, and his situation was discussed without release of his name to the ad hoc group. The group met on March 27, 1997, but no consensus recommendation was reached. Coincidentally, that same day, the National Institute of Health published a new draft consensus statement of health care experts on the management of the disease. The following day, the hospital administrator sent a letter to Sterling stating that Dr. Nelson had been "diagnosed with Hepatitis C" and that upon the recommendation of the Wellness Committee, the hospital was limiting Dr. Nelson's privileges to noninvasive care for the safety of the patients until the hospital's Executive Committee could meet.

Shortly thereafter, the Executive Committee held its regularly scheduled meeting, which Dr. Nelson attended. As a result of the meeting, on April 2, 1997, the hospital administrator notified Sterling that there would be no further restrictions on Dr. Nelson other than the practice of universal precautions. Subsequently, Dr. Nelson

brought suit against the hospital alleging: (1) slander and libel, (2) invasion of privacy, (3) intentional infliction of emotional distress, (4) violation of OCGA § 24-9-40, and (5) punitive damages. The trial court granted defendants' motions for summary judgment, and this appeal followed.

1. Dr. Nelson asserts that questions of fact exist as to (1) whether the oral communication of his diagnosis to the hospital administrator and other hospital staff constitutes slander and (2) whether the hospital administrator's letter to Sterling containing the statement that Dr. Nelson was "diagnosed with Hepatitis C" was libelous.

Slander includes oral defamation which charges that a person has some contagious disorder which may exclude that person from society. OCGA § 51-5-4. Libel, on the other hand, is an expression in writing of a false and malicious defamation which tends to harm a person's reputation or would cause a person to be the subject of public hatred, contempt, or ridicule. OCGA § 51-5-1. A cause of action for libel or slander will fail if the statement is shown to be truthful. OCGA § 51-5-6.

The record shows that Dr. Nelson's blood test did indicate that the hepatitis C antibodies were present in his blood. Thus, the fact that Dr. Nelson had been so diagnosed was true. Even if we assume that the statement that Dr. Nelson was diagnosed with hepatitis C was false, based upon the fact that a single test is not sufficient to determine that one is infectious, and that such diagnosis constitutes a defamatory statement that one has a contagious disease which might exclude a person from society and subject that person to contempt, hatred, or ridicule, Dr. Nelson's claims have no merit, as the statements were not published, were privileged, and were made without malice. The hospital had a duty to the public and to its patients to safeguard them from infectious diseases within their control. There is no question that hepatitis C is an infectious disease. The hospital immediately took action to meet its duty to protect the public, until it satisfied itself that Dr. Nelson, in his medical condition, did not endanger others.

In order to recover for libel or slander, the statement must be published; communication to any other person constitutes publication. OCGA § 51-5-1; *Kurtz v. Williams*.[2] The oral communication of Dr. Nelson's blood test results from the lab technician to the lab director, and then to the hospital administrator and other members of the hospital staff including the Executive Committee, did not constitute publication. "[W]hen the communication is intracorporate, or between members of unincorporated groups or associations, and is

---

[2] *Kurtz v. Williams*, 188 Ga. App. 14, 15 (3) (371 SE2d 878) (1988).

heard by one who, because of his/her duty or authority[,] has reason to receive the information, there is no publication of the allegedly slanderous material, and without publication, there is no cause of action for slander." Id. A review of the record does not disclose any person outside the hospital staff other than Sterling who testified that they heard that Dr. Nelson was diagnosed with HCV from the appellees.[3] The hospital administrator's acknowledgment that other people knew there was some issue being discussed about Dr. Nelson cannot be construed as an admission that the appellees inappropriately disclosed false information about Dr. Nelson.

Recovery for slander is also barred if the statement made was a privileged communication unless actual malice is proven. OCGA § 51-5-5. Communications are deemed privileged if they are "[s]tatements made in good faith in the performance of a legal or moral private duty" or "[s]tatements made with a good faith intent on the part of the speaker to protect his or her interest in a matter in which it is concerned." OCGA § 51-5-7 (2), (3). A defendant relying on privilege must show good faith, an interest to be upheld, a statement properly limited in scope, a proper occasion, and publication to proper persons. *Davis v. Sherwin-Williams Co.*[4]

Clearly, the hospital administrator and the medical center had an interest in protecting the safety of their patients and their own corporate interests in this case. The record clearly demonstrates that the hospital acted in good faith. The administrator testified that his actions were taken under the medical center's policy permitting the release of patient medical information on the basis of a true health care emergency or an unusual, rare circumstance where serving the common good outweighs privacy considerations. His beliefs were not unreasonable in light of the published authorities on HCV from the U. S. Department of Health & Human Services and the Centers for Disease Control which were available at that time. These publications, relied upon by hospital staff to assess the seriousness and infectiousness of the disease, stated that although the risk of HCV transmission in occupational settings was not well defined, all antibody HCV-positive persons should be considered potentially infectious and that current tests did not provide a reliable measure of the degree of infectiousness of the affected individual. Further, the U. S. Department of Health & Human Services publication stated that about half of all persons who have HCV never recover and carry the virus for the rest of their lives.

---

[3] The only person outside Southeast and Sterling who was alleged to have received information from Southeast, Dr. Ross Goehring, denied in his deposition that he had any knowledge about Dr. Nelson's lab test.

[4] *Davis v. Sherwin-Williams Co.*, 242 Ga. App. 907, 908 (531 SE2d 764) (2000).

In order to assert the privilege of good faith, the hospital also has to show that the communication was limited to proper persons. The record indicates that communication of Dr. Nelson's test results was limited to persons directly concerned with the safety of the public and the interests of the hospital. The lab director provided the test results to the hospital administrator out of her concern for the safety of the patients and Dr. Nelson's health. Thereafter, the administrator, who is not a physician, consulted the director of nursing to confirm the seriousness of the test results and the hospital legal counsel to determine what to do. He also spoke with his chief officer of operations, because that officer took the administrator's place at the ad hoc committee meeting during his absence.

The administrator also limited disclosure of Dr. Nelson's diagnosis by instructing the staff to take steps to keep the information confidential, replacing Dr. Nelson's name on his records with initials or with "John Doe." Dr. Nelson's name was not even released to the members of the ad hoc committee. Dr. Nelson cannot complain of the communication to the Executive Committee, since he made sure that the issue would be on the meeting agenda and was in attendance at that meeting. Under these circumstances, we find that the oral statements sharing Dr. Nelson's test results clearly fall within a good faith privilege.

For the same reasons, the letter written from the hospital to Sterling was protected by a good faith privilege, and there is no issue of fact as to Dr. Nelson's libel claim. It was reasonable for the administrator to contact Sterling, who was Dr. Nelson's direct employer. In a similar case, *Dominy v. Shumpert*,[5] we held that the letter from a physician sent to the contract employer of another emergency room physician and the hospital administrator about the performance of that emergency room physician was a privileged communication when it was motivated out of a concern for patient safety.

Dr. Nelson argues that the issuance of the National Institute of Health's revised draft of its consensus statement on the management of HCV on March 27, 1997, the same day the ad hoc committee met and one day prior to the issuance of the letter from the hospital to Sterling, compromises the hospital's good faith privilege based on the seriousness of the disease and its concern for patient safety. We cannot say that it was unreasonable for the hospital administrator, who was not a physician, to rely on the expertise of the internists familiar with the issue, who comprised the ad hoc committee, and his legal counsel in drafting the letter to Sterling. Even if the consensus statement was considered, it still contains warnings of the seriousness of

---

[5] *Dominy v. Shumpert*, 235 Ga. App. 500 (510 SE2d 81) (1998).

the disease, which were found in earlier authorities on which the hospital relied, e.g., a large percentage of individuals who are infected with HCV have chronic infections which have no symptoms, testing is not conclusive as to active infection, and there is some evidence of occupational transmission of the disease, although transmission from health care workers to patients is thought to be rare.

Lastly, although a good faith privilege may be overcome by evidence of actual malice, OCGA § 51-5-5, Dr. Nelson presents no evidence that the discussion of his status among hospital staff or the letter written to Sterling was done maliciously. Dr. Nelson testified that in a meeting with the hospital administrator after the event, the administrator had no criticism of his clinical or management abilities, and the administrator testified that he had a good relationship with Dr. Nelson.

To obtain summary judgment, a defendant must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. *Lau's Corp. v. Haskins.*[6] Based on Nelson's failure to show publication and the existence of a good faith privilege, recovery is barred for slander or libel.

2. Dr. Nelson contends that there are genuine issues of fact relating to his claim for intentional infliction of emotional distress. "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." (Punctuation omitted.) *Lightning v. Roadway Express.*[7] In order to sustain a claim of intentional infliction of emotional distress, Nelson must prove that: "(1) the conduct must be intentional or reckless; (2) it must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe." *Johnson v. American Nat. Red Cross.*[8]

Dr. Nelson's claim of emotional distress lacks merit because the conduct of the appellees was neither intentional or reckless nor outrageous or extreme. The record does not contain any evidence that the hospital administrator or any of the other hospital employees who disclosed Dr. Nelson's test results did so with the intention to cause Dr. Nelson emotional distress or that they acted recklessly under the circumstances. As previously mentioned, Dr. Nelson's identity was kept to a small number of persons in the hospital and Sterling, and his hospital records were altered to protect his anonymity. Moreover, the testimony of the hospital administrator demonstrates

[6] *Lau's Corp. v. Haskins,* 261 Ga. 491 (405 SE2d 474) (1991).
[7] *Lightning v. Roadway Express,* 60 F3d 1551, 1558 (IV) (B) (11th Cir. 1995).
[8] *Johnson v. American Nat. Red Cross,* 253 Ga. App. 587, 593 (3) (569 SE2d 242) (2002).

that the goal of the hospital was to protect Dr. Nelson, the patients, and the hospital's corporate interests.

In order to recover under this cause of action, the conduct upon which the claim for intentional distress is based must also give rise to such intense feelings of humiliation, embarrassment, fright, or extreme outrage as to cause severe emotional distress. *Fitzgerald v. Caplan*.[9] "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." (Punctuation omitted.) *Bridges v. Winn-Dixie Atlanta*.[10]

We cannot find that the conduct here would have given rise to such intense feelings. The record shows that Dr. Nelson's blood test did show that the hepatitis C antibodies were present in his blood and, although not conclusive, this test provides some indication that Dr. Nelson could have an active infection. The facts of this case have similarities to *Fitzgerald*, supra, in which we found a doctor's statement of a diagnosis of cancer, which might not be strictly accurate, was not so outrageous as to support a cause of action for intentional infliction of emotional distress. In *Fitzgerald*, a medical insurance carrier revealed to its insured that the claim submitted by the patient's doctor showed a diagnosis which stated, "Pancreas: Determine Extent of Malignancy," when the patient's examination had shown the possibility of cancer, but no definite diagnosis had been made. The doctor had testified that he had used that language to ensure that the claim would be honored by the insurer.

Further, we find that Dr. Nelson's reliance on *Tolman v. Doe*[11] is misplaced. While Nelson's test results were made known only to hospital personnel and his contract employer, in *Tolman*, a doctor sent letters to another physician's patients and clearly insinuated the physician's lack of integrity and unfitness to perform his job. The Southeast hospital staff communications and letter to Sterling did not include any allegations about Dr. Nelson's job performance or integrity.

Dr. Nelson asserts that our past decisions have held that an employment relationship, because of the employer's power to control the employee, may produce an element of outrageousness that may not otherwise exist in the case. See *Coleman v. Housing Auth. of Americus*[12] (occupancy supervisor harassed by director of housing authority for three years); *Bridges v. Winn-Dixie Atlanta*, supra at 230 (part-time cashier allegedly harassed by security manager). Unlike the plaintiffs in those cases, Dr. Nelson did not have a direct

---

[9] *Fitzgerald v. Caplan*, 184 Ga. App. 567, 568 (362 SE2d 103) (1987).

[10] *Bridges v. Winn-Dixie Atlanta*, 176 Ga. App. 227, 230 (1) (335 SE2d 445) (1985).

[11] *Tolman v. Doe*, 988 FSupp. 582 (E.D. Va. 1997).

[12] *Coleman v. Housing Auth. of Americus*, 191 Ga. App. 166 (381 SE2d 303) (1989).

employer-employee relationship with Southeast, was not "a captive victim who may fear reprisal for complaining," *Coleman*, supra at 167, and was not subjected to repetitive abuse. Under the circumstances of this case, we cannot find that the conduct of the appellees was either intentional or reckless or of the requisite level of outrageousness or egregiousness to support this claim of emotional distress.

3. Dr. Nelson contends there are genuine issues of fact as to his claims of invasion of privacy. In *Cabaniss v. Hipsley*,[13] this Court recognized that the invasion of privacy is in reality a complex of four loosely related torts. Of these four, Dr. Nelson has made a claim based on two of these torts: (1) publicity which places him in a false light in the public eye and (2) public disclosure of embarrassing private facts. To establish the claim of false light, Dr. Nelson must establish that false publicity depicted him as something or someone which he is not and that the false light in which he was placed would be highly offensive to a reasonable person. *Assn. Svcs. v. Smith*.[14] The claim of disclosure of embarrassing private facts requires that "(a) the disclosure of private facts must be a public disclosure; (b) the facts disclosed to the public must be private, secluded or secret facts and not public ones; and (c) the matter made public must be offensive and objectionable to a reasonable man of ordinary sensibilities under the circumstances." (Punctuation omitted.) *Napper v. Ga. Television Co.*[15]

As we found in Division 1, there was no public disclosure by appellees of Dr. Nelson's diagnosis, and, therefore, we find these claims without merit. Even if the letter to Sterling could be considered a publication, Sterling is an organization of health care professionals, and, therefore, the standard for determining the offensive or objectionable nature of the letter would be that of a reasonable health care professional. We cannot find that Dr. Nelson's diagnosis would place him in a light highly offensive to the reasonable health care professional under the circumstances in this case.

4. Dr. Nelson also contends an invasion of privacy based on a failure of the hospital to keep his test result records as a patient confidential. For the purposes of this contention, we assume, without a specific finding, that Dr. Nelson was a patient of Southeast as contemplated under OCGA § 24-9-40 (a). "This court ruled in *Orr v. Sievert*[16] that a physician [or health care organization] has a duty to

[13] *Cabaniss v. Hipsley*, 114 Ga. App. 367, 370 (151 SE2d 496) (1966).
[14] *Assn. Svcs. v. Smith*, 249 Ga. App. 629, 633 (4) (549 SE2d 454) (2001).
[15] *Napper v. Ga. Television Co.*, 257 Ga. 156, 161 (356 SE2d 640) (1987).
[16] *Orr v. Sievert*, 162 Ga. App. 677, 679 (292 SE2d 548) (1982).

protect the privacy of his [or its] patients and that a breach of that duty will give rise to an action for damages." *Jones v. Thornton.*[17]

> However, the law recognizes that the right of privacy is not absolute. But it (right of privacy) must be kept within its proper limits, and in its exercise must be made to accord with the rights of those who have other liberties, as well as the rights of any person who may be properly interested in the matters which are claimed to be of purely private concern.

(Punctuation and emphasis omitted.) *Elmore v. Atlantic Zayre.*[18]

OCGA § 24-9-40 (a) protects from liability any physician, hospital, or health care facility which releases medical information of a patient as long as the information is released under written authorization or other waiver by the patient, or by his or her parents or guardian ad litem in the case of a minor, or pursuant to law, statute, or lawful regulation, or under court order or subpoena.

Dr. Nelson's agreement to abide by the policies and bylaws of Southeast upon application for hospital privileges and his Release and Immunity Statement, which certifies he has no physical or mental impairment that would limit his execution of hospital privileges, i.e., treatment of patients, constitutes a written waiver under OCGA § 24-9-40. In Article XIII of the hospital bylaws, Confidentiality, Indemnification and Immunity, Dr. Nelson authorized hospital representatives and staff to provide and act upon information bearing on his professional ability and qualifications and to waive all legal claims against representatives who act in accordance with the article.

Further, although Section C of this same article ensures the confidentiality of practitioner records, Section D (1) grants the hospital protection from liability upon release of records stating:

> No representative of the Hospital or Staff shall be liable to a practitioner for damages or other relief for any action taken or statement or recommendation made within the scope of his or her duties as a representative, if such representative acts in good faith and without malice . . . and in the reasonable belief that the action, statement, or recommendation is warranted by such facts.

---

[17] *Jones v. Thornton*, 172 Ga. App. 412, 413 (1) (323 SE2d 217) (1984).
[18] *Elmore v. Atlantic Zayre*, 178 Ga. App. 25 (341 SE2d 905) (1986).

Further, Section D (2) provides that

> [n]o representative of the Hospital or Staff . . . shall be liable to a practitioner for damages or other relief by reason of providing information, including otherwise privileged or confidential information, to a representative of this Hospital or Staff or to any other healthcare facility or organization of health professionals concerning a practitioner . . . who did or does exercise clinical privileges . . . at this Hospital provided that such representative . . . acts in good faith and without malice.

Under these provisions, Dr. Nelson has executed a waiver relieving Southeast and its representatives of liability if Southeast acted in good faith and without malice. Since Sterling is also an organization of health care professionals, the release of Dr. Nelson's test results to Sterling is also covered by this waiver. Having addressed the issues of good faith and malice in previous Divisions in favor of appellees, we cannot find a genuine issue of fact upon which Dr. Nelson's claim can stand.

5. Lastly, Dr. Nelson makes a claim for punitive damages. In accordance with OCGA § 51-12-5.1, punitive damages can only be awarded as additional damages. Since Dr. Nelson has been unable to demonstrate that there is an issue of fact as to his other claims for damages, his claim for punitive damages also fails.

*Judgment affirmed. Johnson, P. J., and Miller, J., concur.*

DECIDED SEPTEMBER 24, 2002.

*Bouhan, Williams & Levy, Walter C. Hartridge, David M. Conner, Austin E. Catts*, for appellant.

*Taylor, Odachowski & Sperry, Philip R. Taylor*, for appellees.