A03A2271. ABF CAPITAL CORPORATION v. YANCEY.
(592 SE2d 492)

BLACKBURN, Presiding Judge.

In this contract action, ABF Capital Corporation ("ABF") appeals the trial court's denial of its motion for summary judgment and grant of summary judgment to Robert E. Yancey, contending that the trial court inappropriately applied OCGA § 11-2-107 to determine that ABF's suit was not timely filed. Because we find that this action is subject to the statute of limitation set forth in OCGA § 9-3-24, not OCGA § 11-2-725, we agree that ABF's action was timely filed and, therefore, reverse.

> Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable con-

clusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation and footnote omitted.) *Nelson v. Glynn-Brunswick Hosp. Auth.*[1]

Viewed in this light, the record shows that, in the early 1980s, Yancey became a limited partner in a New York limited partnership tax shelter known as Regent Energy Partners (the "Partnership"). The Partnership entered into an agreement to sublease land from ABF for exploratory drilling for oil and natural gas and to have ABF arrange for drilling on the subleased land. Under the terms of an Assumption of Liabilities Agreement ("Assumption Agreement"), the limited partners assumed liability for payment of the royalties to ABF; in return, ABF would sublease land to them, facilitate drilling on the land pursuant to a Turnkey Drilling Contract, and defer receiving payments otherwise due ABF from the Partnership. Yancey, as a limited partner of the Partnership, personally guaranteed payment of minimum annual royalty payments to ABF in an amount proportional to the number of units of participation in the Partnership which he had purchased.

In order to secure the tax benefits contemplated by the tax shelter, the limited partners were required to pay the royalties to ABF regardless of whether oil or natural gas was ever discovered. Under the terms of the Assumption Agreement, any deferred sublease payments remaining unpaid by the Partnership became due and payable by the limited partners on the twelfth anniversary of the sublease, which had been entered into by the partners on December 31, 1982. Because neither oil nor gas was ever produced commercially on the subleased lands, the limited partners became liable for payment of the deferred sublease payments. Yancey had purchased six units of participation, each unit carrying with it a maximum liability of $13,500. Thus, Yancey became personally liable to ABF in the principal amount of $81,000 on December 31, 1994.

Yancey has not paid any of the amount due under the Assumption Agreement, ignoring ABF's repeated requests for payment. On December 5, 2000, ABF filed suit against Yancey. Both Yancey and ABF filed motions for summary judgment. The trial court granted that of Yancey and denied that of ABF, finding that the Assumption Agreement was part of a transaction whose dominant purpose was the sale of oil and gas. The trial court reasoned that, because the subleases and drilling contract constituted contracts for the sale of goods under OCGA § 11-2-107, the Assumption Agreement was governed

---

[1] *Nelson v. Glynn-Brunswick Hosp. Auth.*, 257 Ga. App. 571 (571 SE2d 557) (2002).

by the four-year statute of limitation of OCGA § 11-2-725, and ABF's lawsuit was, therefore, time-barred. We disagree.

The trial court improperly applied the four-year statute of limitation under OCGA § 11-2-725 to the contract. Under OCGA § 11-2-102, the provisions of the Uniform Commercial Code apply "to transactions in goods." "A contract for the sale of timber, minerals, or the like (including oil and gas) . . . is a contract for the sale of goods within this article if they are to be severed by the seller." OCGA § 11-2-107. The contracts between the Partnership, the individual limited partners, and ABF, however, were entered into primarily in order for the Partnership to secure from ABF a leasehold interest in prospective oil and gas properties which would provide the Partnership with a tax shelter available to oil and gas producers. The sale of oil or gas which might be produced, if any, was merely a secondary goal of the contract wholly subsidiary to creation of a tax shelter, and such sales would have been made, not by ABF to the Partnership, but by the Partnership to as yet unidentified third parties. The contracts are, therefore, governed by OCGA § 9-3-24, which provides that all actions on "simple contracts in writing shall be brought within six years after the same become due and payable."

The Assumption Agreement provides that it is to be governed by and construed under the laws of the State of New York. Under New York law, "[w]here the provisions of a contract are clear and unambiguous and the intent of the parties can be gleaned from the four corners of the document, a court should interpret the contract in accordance with its plain and ordinary meaning." *Edwards v. Poulmentis*.[2] Georgia follows the same rule. See, e.g., *Fulton County v. Collum Properties*[3] (" '[w]here the terms of a written contract are clear and unambiguous, the court will look to the contract alone to find the intention of the parties' "). We look, therefore, to the language of the agreements between the parties to ascertain their intentions.

Under the terms of the Assumption Agreement, the Partnership entered into a sublease of certain oil and gas properties, each of which contained drilling units. Under the sublease, the Partnership was required to pay ABF a production royalty from the revenues earned from production on the properties. The Partnership was also liable for minimum annual royalties on each drilling unit on execution of the sublease and on each anniversary of the sublease's execution for the shorter of 20 years or so long as the Partnership retained the drilling units. However, the Partnership was entitled to apply

---

[2] *Edwards v. Poulmentis*, 763 N.Y.S.2d 677, 679 (307 AD2d 1051) (2003).

[3] *Fulton County v. Collum Properties*, 193 Ga. App. 774, 775 (1) (b) (388 SE2d 916) (1989).

"aggregate minimum royalties paid or incurred against the production royalty on oil and gas·thereafter produced."

The Partnership also entered into a Turnkey Drilling Contract, under which it was unconditionally obligated to pay the driller $945,080 for the drilling and estimated completion costs of the wells. The Assumption Agreement also called for ABF to be paid out of the "production revenues," specifically defining "production revenues" as "the gross revenues of the Partnership from the sale of oil and gas produced from the property which is the subject of the Sublease reduced by all windfall profit tax." The Turnkey Drilling Contract also provided:

> The Driller shall have at all times a first preferred lien on the Partnership's interest in all the oil and gas from any Drilling Unit and the proceeds thereof and upon the Partnership's interest in material and equipment to secure the payment of all sums due from the Partnership to the Driller. Driller, without prejudice to other existing remedies, is authorized to collect from the purchaser or purchasers of oil or gas the proceeds accruing to the Partnership up to the amount owing, including interest and reasonable attorneys' fees, and each purchaser of oil or gas is authorized to rely upon Driller's statement as to the amount owing by such party.

Under the terms of the Confidential Private Placement Memorandum ("Placement Memorandum"), the Partnership's general partner would receive compensation "once the first well is in production and the Partnership has begun to receive income therefrom." The general partner was also to receive an expense allowance "as soon as the first well is placed in production and the Partnership begins to receive income therefrom." In another paragraph of the Placement Memorandum, the general partner was authorized to take certain actions "[t]o the extent that Partnership funds are available, including proceeds of production."

The Placement Memorandum states that approximately 80 percent of the proceeds of the offering will be used for the acquisition of the oil and gas property and the actual drilling and completion of the wells. The balance of the proceeds are earmarked for management fees, legal fees, working capital, and organization and syndication costs. None of the proceeds are to be used for the purchase of oil and gas. Further, there is no provision or clause anywhere in the contracts stating that the Partnership is to buy oil and gas from ABF, nor are quantities of oil and gas to be purchased, and the prices to be paid for them, ever set forth. These facts indicate that amounts paid

to ABF by the Partnership were not in payment for the sale of oil or gas by ABF to the Partnership, but were for the leasing of the oil and gas properties and for drilling and other services. It was the Partnership, not ABF, that was to be the seller of the oil and gas and receive any income from such sales.

The Placement Memorandum goes on to warn that exploration for oil and gas is extremely hazardous and involves a high risk of loss. For this reason, "[t]here can be no assurance that the wells drilled on behalf of the Partnership will obtain production, nor that the Partnership will recoup all or any part of its investment incurred in obtaining production." "There is no guarantee that there will be adequate oil and/or gas production such that the Production Royalty will generate proceeds sufficient to satisfy the obligations assumed, in which case the Limited Partner will remain personally liable for the amounts assumed." Still another paragraph acknowledges that no oil or gas may be produced:

> In the event that no production results from the initial drilling or that such production does not reach projected levels or that the price of oil or gas is substantially below that projected, the Partnership will not have sufficient funds to participate in drilling other well sites which it has leased from ABF without raising additional capital.

Despite this, the royalty payments are to be made regardless of whether any oil or gas is actually produced. "The Minimum Annual Royalty constitutes an advance payment of the Production Royalty. However, the Sublessor's right to the Minimum Annual Royalty is not dependent upon production; it must be paid in any event as required by the Subleases." In short, the payments made by the Partnership to ABF had nothing to do with the sale of oil or gas.

The Placement Memorandum provides abundant evidence that the true purpose of the contracts between the Partnership, the limited partners, and ABF was not the sale of oil or gas, but the creation of an entity through which the limited partners could take advantages of tax benefits and deductions. These benefits and deductions could be secured only if the Partnership received the income from the sale of oil and gas. In explaining the tax benefits of the Partnership, the Placement Memorandum advises: "The Partnership has an 'economic interest' in the Prospects since its interest is not terminable at will by the lessor and its income will result solely from the production and sale of the minerals." With respect to the tax preferences associated with intangible drilling costs, it explains: "The extent to which intangible drilling costs will constitute items of tax preference in subsequent years will depend upon the time at which the wells are

drilled, the Partnership's net income from oil and gas, and each Partner's net income from oil and gas in other programs in each subsequent taxable year." These provisions make clear that it is the Partnership, not ABF, which owns the rights to any oil or gas which may be produced, will be selling the oil or gas to purchasers, and will be entitled to tax deductions associated with drilling operations and the sale of oil and gas, as well as proceeds from the production and sale of oil and gas.

Elsewhere, the Placement Memorandum states:

> The Partnership will primarily engage in the acquisition of oil and gas property in Texas and Louisiana and the drilling, development and operation of oil and gas wells on such property. The Partnership intends to acquire rights to do such drilling by subleasing same from ABF, the Sublessor. Under the Subleases, the Partnership will become obligated for fixed amounts of royalty payments for each year that the Subleases are in effect. . . . By accruing these royalty payments annually, although the actual payment of same is deferred, and by accruing certain intangible drilling costs, the Partnership is able to generate projected losses in the first two taxable years of operation (1982 and 1983) while production is still low, and thus produce the leverage effect which is discussed . . . below and in the Tax Opinion attached hereto as Exhibit A.

That the minimum annual royalty had to be paid in the absence of the production of oil or gas was, of course, part of the tax strategy of the Partnership, which was specifically set up as a tax shelter. As the Placement Memorandum points out, the Internal Revenue Service allows a taxpayer to deduct an advanced royalty paid or incurred if such royalty constitutes a minimum annual royalty. "To constitute a minimum annual royalty, the advanced royalty must be paid in 'substantially uniform' amounts annually over the life of the lease or for twenty years in the absence of mineral production requiring aggregate royalties in a greater amount." Thus, the limited partners had to pay the minimum annual royalties in order to be able to deduct the amount of the payments from income tax due.

Another tax consideration affecting the Partnership contracts, as explained by the Placement Memorandum, is the fact that a taxpayer may not take a deduction for a loss from an activity in an amount greater than the amount the taxpayer has at risk in the activity. By providing that the limited partners were each personally liable for a portion of the Partnership's minimum annual royalties, each partner would "be 'at risk' to the extent of his capital contribution plus the

amount of the liability for which he personally assumes primary liability."

The Placement Memorandum further provides that "[t]he Partnership is a producer and it is anticipated that the Partnership will be responsible for the windfall profit tax." It advises "that the windfall profit tax is deductible when computing income tax due. Thus, producers will be entitled to reduce their gross income (for income tax purposes) by the amount of windfall taxes paid in order to arrive at taxable income." It goes on to explain that "[a]lthough the tax is imposed on the producer of domestic crude oil, primary collection responsibility is on the first purchaser of the crude oil." This discussion of the tax ramifications of the windfall profit tax clearly indicates the intent of all parties that the Partnership be the producer which will be able to take advantage of the tax deduction after the crude oil has been produced, and that though the Partnership, as the producer and seller of the crude oil must pay the tax, the future purchaser of the oil will be responsible for collecting the tax.

The Placement Memorandum also discusses the Natural Gas Policy Act ("NGPA"). The discussion of the NGPA outlines what the Partnership, as the producer and seller of the gas, must do to collect NGPA ceiling prices for new natural gas, prices that would be collected by a seller, not a buyer, of gas.

We need not recite further language from the various documents. The contract provisions outlined above, as well as the absence of any provision in the contracts obligating the Partnership to buy oil or gas, indicate that no sale of oil or gas to the Partnership by ABF was contemplated by the parties. The subleases, under which Yancey was liable for a portion of the royalty payments, do not involve the sale of oil or gas, but are conveyances of leasehold interests in the real property upon which the drilling and production were to take place. Payment of Yancey's pro rata portion of the minimum annual royalties for which he was liable did not depend on the production of any oil or gas, and, in fact, no oil or gas was ever commercially produced on the subleased properties. The Turnkey Drilling Contract, which is not involved in this case, is a contract for drilling and maintenance services to be performed by ABF. The Assumption Agreement, under the terms of which ABF has brought its suit against Yancey, was certainly not, as the trial court found, a transaction whose dominant purpose was the sale of oil and gas. The purpose of the Assumption Agreement, an agreement between Yancey and the Partnership which made Yancey personally liable for the payments due from the Partnership to ABF under the sublease, was to secure certain tax benefits available to mineral producers under the Internal Revenue Code. Had ABF been the seller of the oil and gas, it, not the Partnership, would have been entitled to take advantage of the tax benefits

and the purpose of the Partnership would have been defeated. Clearly, then, no sale of oil or gas by ABF to the Partnership is involved in this case. Accordingly, the Assumption Agreement did not involve the sale of goods under OCGA § 11-2-107, and ABF's lawsuit was not barred by the four-year statute of limitation of the Uniform Commercial Code. ABF's claim is subject, instead, to the six-year statute of limitation on contracts in writing, set forth in Section 382 of the New York Code of Civil Procedure and in OCGA § 9-3-24. ABF's action was, therefore, timely filed.

Yancey does not dispute that he was a limited partner in the Partnership, that he signed the Assumption Agreement, that pursuant to the Assumption Agreement he provided a personal guaranty of a portion of the Partnership's obligations to ABF, or that any liability he owes to ABF arose on December 31, 1994. Yancey's only argument on appeal is that ABF's lawsuit is barred by the commercial code's four-year statute of limitation. It follows, then, that the trial court erred in both denying ABF's motion for summary judgment and granting Yancey's motion.

*Judgment reversed. Ellington and Phipps, JJ., concur.*

DECIDED DECEMBER 18, 2003.

*Foltz Martin, Michael D. Robl, Kevin H. Hudson*, for appellant.
*Greenberg Traurig, Mark G. Trigg*, for appellee.