## A10A1385. PATTMAN v. MANN et al.

(701 SE2d 232)

MIKELL, Judge.

Fifty-eight-year-old Willie Pattman was admitted to Banks, Jackson, Commerce Hospital and Nursing Home Authority d/b/a BJC Medical Center ("BJC") on August 8, 2003, for gastrointestinal bleeding and died the following day. His surviving spouse and the administrator of his estate, Mary Alice Pattman, filed a wrongful death action against Lorraine Dale Mann, R.N.; Roberta Faye Samet Keller, R.N.; and BJC (collectively "appellees"), alleging that appellees' failure to obtain blood and administer a blood transfusion in a timely manner, as ordered by Mr. Pattman's treating physician, caused Mr. Pattman's death. The trial court granted summary judgment in favor of appellees, ruling that Pattman's claims sounded in professional negligence — not ordinary negligence — which required an affidavit pursuant to OCGA § 9-11-9.1. Pattman appeals, contending generally that the trial court erred in granting summary judgment on her ordinary negligence claim. We disagree and affirm.

> To prevail at summary judgment . . . , the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evi-

dence in the record reveal that there is no evidence suffi-
cient to create a jury issue on at least one essential element
of plaintiff's case. If there is no evidence sufficient to create
a genuine issue as to any essential element of plaintiff's
claim, that claim tumbles like a house of cards. All of the
other disputes of fact are rendered immaterial. . . . If the
moving party discharges this burden, the nonmoving party
cannot rest on its pleadings, but rather must point to
specific evidence giving rise to a triable issue.[1]

We review de novo a trial court's grant of summary judgment,
construing the evidence most favorably to the nonmovant.[2] So
viewed, the evidence shows that on August 8, 2003, Mr. Pattman
went to his cardiologist, Dr. Narasimhulu Neelagaru, to obtain
treatment for rectal bleeding.[3] Dr. Neelagaru, who previously had
prescribed the blood thinner Coumadin for Mr. Pattman's cardiac
condition, diagnosed him with gastrointestinal bleeding and admit-
ted him to BJC at approximately 6:00 p.m. At BJC, Mr. Pattman
received treatments ordered by Dr. Neelagaru and a physician's
assistant. At approximately 6:00 a.m. on August 9, 2003, Dr. Neela-
garu ordered fresh frozen plasma and a blood transfusion; however,
because Mr. Pattman had rare antibodies in his blood, the blood had
to be obtained from the American Red Cross in Atlanta, which also
tested a sample of Mr. Pattman's blood for antibody identification
and cross-matching. In the meantime, Mr. Pattman received continu-
ing medical treatment, including the fresh frozen plasma and other
medications while the ICU awaited delivery of the blood. At approxi-
mately 6:40 p.m., a courier service delivered the blood to BJC.
According to Riczen Mamites, the medical technologist on duty in
the BJC laboratory at the time the blood was delivered, when blood
arrives at the hospital it is retyped, a process that takes 15 to 30
minutes. Mamites testified that the blood would have been ready by
7:30 p.m. at the latest, and that he called the ICU to pick it up but
that no one came. According to appellee Lori Mann, the nurse on
duty in the ICU from 7:00 a.m. to 7:00 p.m. on August 9, the
laboratory never called to advise that the blood had arrived or that it
was ready for pickup. Appellee nurse Keller testified that she was on
duty at 6:00 a.m. on August 9, when Dr. Neelagaru ordered a blood
transfusion and that when she came back on duty at approximately
7:00 p.m., no blood transfusion had been given. At 7:27 p.m., Mr.

---

[1] (Citations omitted; emphasis in original.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405
SE2d 474) (1991).

[2] *Rooks v. Tenet Health System GB*, 292 Ga. App. 477 (664 SE2d 861) (2008).

[3] Dr. Neelagaru was a party to the original action but was dismissed with prejudice.

Pattman experienced a cardiac arrest and died shortly thereafter.

Pattman filed a wrongful death action on July 22, 2005, alleging that appellees committed professional negligence in their care and treatment of her husband. Although the complaint references an attached affidavit, filed in accordance with OCGA § 9-11-9.1, one is not attached to the complaint. However, in response to BJC's request for production of documents, Pattman filed the affidavit of Andre Jawde, M.D., a cardiothoracic surgeon. Shortly thereafter, BJC moved to exclude Dr. Jawde's expert testimony on the ground that he was not qualified as an expert under OCGA § 24-9-67.1. The trial court granted the motion, ruling that Dr. Jawde lacked the requisite experience and knowledge in nursing and/or hospital laboratory operations to offer standard of care testimony against appellees. The trial court further ruled that Dr. Jawde's opinion, that Mr. Pattman would not have died had he received a blood transfusion any time before he went into cardiac arrest, was speculative and lacked scientific support. Following this ruling, appellees moved for summary judgment, alleging that Pattman's claim for professional negligence was unsupported by expert medical testimony. Pattman subsequently amended her complaint, alleging that Mann, Keller, and other BJC employees/agents committed ordinary negligence in failing to comply timely with Dr. Neelagaru's orders to obtain and administer frozen plasma, vitamin K, and red blood cells. The trial court concluded that Pattman's claims sounded in professional negligence, requiring expert testimony and, therefore, granted summary judgment to appellees. This appeal followed.

In three related enumerations of error, Pattman contends that the trial court erred in granting summary judgment in favor of appellees because her wrongful death claim alleges only ordinary negligence. We disagree.

"Whether a complaint alleges ordinary negligence or professional malpractice is a question of law for the court, regardless of how the plaintiff categorizes it."[4]

> Although complaints against professionals may state claims based on ordinary as well as professional negligence, where the allegations of negligence against a professional involve the exercise of professional skill and judgment within the professional's area of expertise, the action states professional negligence.[5]

---

[4] (Punctuation and footnote omitted.) *Walls v. Sumter Regional Hosp.*, 292 Ga. App. 865, 868 (2) (666 SE2d 66) (2008).

[5] (Punctuation and footnote omitted.) Id. at 868-869 (2).

"If a claim of negligence goes to the propriety of a professional decision rather than to the efficacy of conduct in the carrying out of a decision previously made, the claim sounds in professional malpractice."[6] However, "administrative, clerical, or routine acts demanding no special expertise fall in the realm of simple negligence."[7]

Pattman argues that the failure of Mamites, the lab technologist, to notify nurses that the blood had arrived did not involve the exercise of professional skill and judgment but was a purely administrative act, "a simple, mandatory, and non-discretionary phone call," sounding in ordinary negligence. In support of this assertion, Pattman points to Mamites's deposition testimony, wherein he stated that laboratory/hospital procedure required him to call the ICU twice, once when the blood arrived and a second time when the blood was ready. We are not persuaded by Pattman's attempt to categorize her claim as one involving a simple failed telephone call. As noted previously, Pattman alleged in her amended complaint that BJC employees and agents failed to comply timely with Dr. Neelagaru's orders to obtain and administer frozen plasma, vitamin K, and red blood cells. While we have held that a hospital employee's failure to carry out instructions can constitute ordinary negligence,[8] such is not the case here. The allegation of negligence here was not that a simple phone call was not made, but that the red blood cells and other treatments were not administered to Mr. Pattman as quickly as they should or could have been, and that this failure to act timely caused Mr. Pattman's death. Whether or not the treatments ordered by Dr. Neelagaru and carried out by BJC employees were timely, particularly given that Mr. Pattman's blood contained rare antibodies, is a question of medical judgment and the duties involved in the administration of medications and treatments constitute a professional service.[9] In this case, BJC agents/employees "[were] not simply effecting a judgment previously made by another, [they were] exercising an independent medical judgment that required [them] to evaluate [Mr. Pattman]"[10] and then act accordingly to obtain blood compatible with his condition. Whether BJC employees should have recognized that this was a medical emergency, whether they proceeded correctly given the medical situation, whether they should

---

[6] (Punctuation and footnote omitted.) *Baskette v. Atlanta Center for Reproductive Medicine*, 285 Ga. App. 876, 880 (3) (648 SE2d 100) (2007); *Upson County Hosp. v. Head*, 246 Ga. App. 386, 389 (1) (540 SE2d 626) (2000).

[7] (Punctuation and footnote omitted.) *Baskette*, supra at 880 (4).

[8] See *Smith v. North Fulton Med. Center*, 200 Ga. App. 464, 465-466 (1) (408 SE2d 468) (1991) (heavily sedated patient fell out of bed; evidence showed her bed rail was down).

[9] See, e.g., *Wellstar Health System v. Painter*, 288 Ga. App. 659 (655 SE2d 251) (2007).

[10] Id. at 662.

have called the lab to ascertain the whereabouts of the blood and/or advise the lab that Mr. Pattman's situation was urgent, and whether Mr. Pattman died as a result of the delays allegedly caused by hospital employees are all medical questions that require expert testimony.[11] Contrary to Pattman's argument, "this is not a case involving merely administrative actions by the employees, such as simply moving the patient or leaving the patient unsupervised and unrestrained."[12]

Even if this Court were to categorize Pattman's claim against BJC as one for ordinary negligence based on Mamites's alleged failure to call the ICU when the blood arrived, we agree with the trial court that Pattman has failed to demonstrate a causal connection between this negligent conduct and Mr. Pattman's death.[13] In order to maintain a cause of action for ordinary or professional negligence, a plaintiff must prove the following elements: "(1) a legal duty to conform to a standard of conduct; (2) a breach of this duty; (3) a causal connection between the conduct and the resulting injury; and (4) damage to the plaintiff."[14] "If the defendant is successful in piercing plaintiff's pleadings with regard to one essential element, the defendant is entitled to summary judgment regardless of whether issues of fact remain with regard to the other elements."[15]

Here, Pattman has pointed us to no admissible medical testimony to support her claim that Mamites's failure to call the ICU when the blood arrived caused her husband's death. On the other hand, appellees supported their summary judgment motion with the deposition of Dr. Dollar, who testified that even if Mamites had called the ICU when the blood arrived at 6:40 p.m., the blood had to be retested and would not have been ready for another 20 minutes. Dr. Dollar averred that arrival of the blood in the ICU at 7:10 p.m. or even 7:00 p.m. was still too late to save Mr. Pattman's life. It was Dr. Dollar's unequivocal opinion that Dr. Neelagaru was guilty of "gross malpractice and negligence"; he did not have any criticism of the hospital's actions. Dr. Dollar deposed that Dr. Neelagaru and his staff

---

[11] See id.

[12] (Punctuation omitted.) Id. at 663, citing *Shirley v. Hosp. Auth. of Valdosta/Lowndes County*, 263 Ga. App. 408, 410 (1) (587 SE2d 873) (2003).

[13] The affidavit requirement does not apply to any acts committed by Mamites, who is not recognized as a "professional" under Georgia law. See OCGA § 14-7-2. Compare *Robinson v. Med. Center of Central Ga.*, 217 Ga. App. 8, 9 (456 SE2d 254) (1995) ("affidavit is required in an action against a hospital where . . . liability is predicated on the doctrine of respondeat superior and the averment of acts or omissions requiring the exercise of professional skill and judgment by agents or employees who themselves are recognized as 'professionals' under [the Code section]") (citation and punctuation omitted).

[14] (Citations omitted.) *Johnson v. American Nat. Red Cross*, 253 Ga. App. 587, 591-592 (2) (569 SE2d 242) (2002).

[15] (Citation and punctuation omitted.) Id. at 592 (2).

should have made it clear in the initial transfusion order at 6:00 a.m. that this was a medical emergency and that in such a situation, he would have called the blood bank himself to convey the urgency of the situation. According to Dr. Dollar, if the blood had arrived at noon and was administered in a timely fashion, Mr. Pattman may have survived; however, *at the same time*, it was incumbent upon Dr. Neelagaru to reverse the "anticoagulation" of Mr. Pattman's blood by ordering the proper amount of fresh frozen plasma, which he did not do.[16] Nevertheless, Pattman contends that there is expert testimony by Drs. Jawde and Neelagaru that Mr. Pattman would have survived had he received a blood transfusion. While Dr. Jawde testified that Mr. Pattman's condition could have been reversed had he received a blood transfusion at 7:00 p.m. or 7:10 p.m., the trial court excluded Dr. Jawde's testimony as speculative and lacking scientific support, and Pattman has not challenged that ruling. As for Dr. Neelagaru's testimony, he merely agreed that Mr. Pattman died from blood loss and opined that he would not have died if he had not experienced such massive blood loss. Because there is no evidence that Mr. Pattman would have survived had Mamites called the ICU when the blood arrived and/or was ready, Pattman cannot "point to specific evidence giving rise to a triable issue."[17]

Pattman contends that she does not need to provide medical evidence of causation because the link between Mamites's negligent act and Mr. Pattman's death is well within the common knowledge of a jury. This argument is controlled adversely to Pattman by *R. J. Taylor Mem. Hosp. v. Gilbert*,[18] which also involved a simple negligence claim against a hospital under the doctrine of respondeat superior. "Although [Mamites's negligence in failing to call the ICU] was not an issue involving expert medical testimony . . . [,] the proximate cause of the damages sought by [Pattman] does present a medical question controlled by expert medical testimony."[19] The question of whether or not Mamites's failure to call the ICU, resulting in the failure of the ICU to administer a blood transfusion, caused Mr. Pattman's death, requires expert testimony, which was excluded in this case.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

---

[16] Pattman's own (excluded) expert, Dr. Jawde, opined that Dr. Neelagaru should have ordered the fresh frozen plasma, blood, and blood typing and cross-matching upon Mr. Pattman's admission to BJC on the evening of August 8, 2003.

[17] (Punctuation and footnote omitted.) *Naik v. Booker*, 303 Ga. App. 282, 290 (2) (692 SE2d 855) (2010) (Mikell, J., concurring specially).

[18] 213 Ga. App. 104 (443 SE2d 656) (1994), rev'd on other grounds by *Gilbert v. R. J. Taylor Mem. Hosp.*, 265 Ga. 580 (458 SE2d 341) (1995).

[19] (Citation omitted.) *R. J. Taylor*, supra at 105.

DECIDED NOVEMBER 17, 2010 —
RECONSIDERATION DENIED DECEMBER 15, 2010.

*David E. Betts*, for appellant.
*Huff, Powell & Bailey, Anna B. Fretwell*, for appellees.