**FIRST DIVISION**
**BARNES, P. J.,**
**MERCIER and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 12, 2020**

# In the Court of Appeals of Georgia

A19A2439. GIDDENS v. THE MEDICAL CENTER OF CENTRAL
    GEORGIA.

BROWN, Judge.

Following a craniotomy to remove an arachnoid cyst, Kimberly Giddens suffered a brain infection, resulting in permanent neurological injuries. Giddens sued Dr. Hugh F. Smisson, III, and The Georgia Neurological Institute, P.C., for professional negligence, and The Medical Center of Central Georgia for professional and ordinary negligence, alleging that MCCG's nurses and mid-level providers violated accepted medical practices by not following Smisson's order to administer a pre-operative antibiotic. The trial court granted summary judgment to MCCG on all claims, concluding that MCCG did not employ the nurse anesthetist and that it was her job to administer the pre-operative antibiotic. Giddens appeals from that order.

For the reasons that follow, we affirm the grant of summary judgment to MCCG on Giddens' ordinary negligence claim, but reverse the grant of summary judgment to MCCG on Giddens' professional negligence claim.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c).

> In reviewing a grant or denial of summary judgment, we owe no deference to the trial court's ruling and we review de novo both the evidence and the trial court's legal conclusions. Moreover, we construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion.

(Citation and punctuation omitted.) *Swint v. Alphonse*, 348 Ga. App. 199, 199-200 (820 SE2d 312) (2018). So viewed, the evidence shows that on December 16, 2014, Giddens underwent a craniotomy at MCCG performed by Smisson. Giddens arrived at the hospital at 6:14,[1] and was taken to the operating room at 11:36, where she was met by Smisson, anesthesiologist Dr. Alvin Sewell, circulating nurse Tamakia Brooks, scrub nurse Kelly Canez, physician's assistant Audrey Cabe, and certified registered nurse anesthetist ("CRNA") Susan Anderson. Giddens was prepped for surgery, a process that Smisson and MCCG staff deposed would have taken at least

---

[1] All times are in military time.

60 to 90 minutes, and at 12:40, Anderson administered 1 gram of the antibiotic Ancef, pursuant to Smisson's written order dated December 15, 2014, which instructed that Giddens be given 1 gram of Ancef "within one hour before surgery." On a checklist prepared by Brooks before the start of surgery, Brooks handwrote, "Ancef one gram at 1240." There is some dispute as to when the surgery began. According to one anesthesia record, the "incision time" for Giddens' surgery was "1305," but another anesthesia record reflects that the time was 12:05.[2] And, one of the entries on the medical chart created during the surgery reflects a start time of "12:05:00."

Brooks, however, who was in charge of "charting" or "documenting" Giddens' electronic medical record during the surgery, deposed that she mistakenly documented the start time of the procedure as 12:05, when it should have been 13:05. Brooks explained that her manager, Rhonda Beeland, alerted her to the error on January 5, 2015, and told her to change the time. At her deposition, Brooks testified

_____

[2] CRNA Anderson averred that at the time of Giddens' surgery, she was employed by American Anesthesiology of Georgia, LLC, and not MCCG, and that it was her responsibility to administer the antibiotic to Giddens. Anderson further averred that: (1) she administered the antibiotic at 12:40 per Smisson's order, which was within one hour before surgery; (2) the incision occurred at 13:05 based on her manual entry on the anesthesia records; and (3) "[i]t [was] impossible that incision occurred at 12:05pm . . . based upon [her] manual entries . . . in the anesthesia records."

that Beeland told her about this lawsuit and that her "belief [from speaking to Beeland] was . . . that there was going to be a lawsuit about this particular event[.]" In an errata sheet after her deposition was complete, Brooks clarified that she does not remember Beeland telling her to make the change because of a lawsuit, but "assumed [that fact] because there is now a lawsuit."[3] Brooks agreed with Beeland that she had made an error, and changed the start time from 12:05 to 13:05.[4] Brooks stated that her decision to change the chart was based upon her "charting," and not because Beeland told her to change the entry. Brooks explained that the chart shows that she updated Giddens' family at 13:09, something that she does routinely "after incision is made"; she would not wait a whole hour to update the family. Brooks

---

[3] Brooks' errata sheet does not erase from the record her original deposition testimony. See *J.H. Harvey Co. v. Reddick*, 240 Ga. App. 466, 473-474 (2) (522 SE2d 749) (1999).

[4] Given how long it takes to prepare a patient for surgery, Smisson testified that it was "impossible" for the surgery start time to have been 12:05. Smisson explained that it takes an hour or more after a patient enters the operating room before the patient is registered "in the brain lab," which Beeland confirmed was the mapping machine used on Giddens to find the cyst. Canez, the surgical scrub technician present during the surgery, also averred that it was impossible for the incision to have occurred at 12:05 because "[t]here is no possible way that the operating team could prep a patient for this craniotomy in 29 minutes[;] prep for a craniotomy takes at minimum 45 minutes to one hour from the time the patient enters the operating room to incision time."

pointed out additional indicators throughout the chart that supported the 13:05 start time, including that she "started charting around 1310" as evidenced by the "first wound class entry" made at 13:10, as well as a discussion about the patient's allergies which occurred at 13:11, and the administration of a beta blocker at 13:14. As to the discrepancy in the anesthesia records, an MCCG system analyst averred that the incorrect time of 12:05 entered by Brooks into Giddens' computer medical chart automatically populated in the demographic bar of the anesthesia record, but that CRNA Anderson already had manually typed into the anesthesia record the correct incision time of 13:05; when Brooks subsequently corrected the incision time, it did not auto-correct in the anesthesia record because that document already had been finalized. The surgery ended at 14:29, and Giddens was discharged from the hospital the following day.

On January 5, 2015, twenty days after the surgery, Giddens presented to Smisson's office, complaining of drainage from the surgery wound, and was told by Smisson that she had a suture abscess. Smisson advised her to use Neosporin and shampoo the site. The same day, Beeland received an email from a quality assurance nurse working with "the anesthesia group," which stated as follows:

5

Can you please review an incision time on case performed **12/16/14?**
**Kimberly Giddens** . . . I have spoken with Amy Greene AA and she
states that the anesthetist incision time listed as 1305 is correct. The
circulator has listed 1205 as the incision time. . . . can you please review
this as well? Since there are [two] different incision times, we need
incision time verification to avoid having an antibiotic failure.[5]

Giddens returned to Smisson's office four days later, at which time he admitted her to the hospital, and she underwent a surgical wound cleaning, which included removal of the area of infection. Several days later, Giddens presented with neurological deficits caused by an abscess, including right-sided paralysis. Smisson performed another operation the following day to remove the abscess from Giddens' brain.

In her complaint, filed on December 16, 2016, Giddens alleged that she has undergone additional surgeries and therapies, and experienced permanent neurological injuries, as a result of the brain infection caused by the defendants'

---

[5] In her deposition, Beeland explained that she understood the term "antibiotic failure" to mean, "mak[ing] sure the start times are correct, that the antibiotic was given within 60 minutes of the incision." Beeland did not interpret the email as asking her to change the incision time, but rather, review the time. After receiving the email, Beeland immediately reviewed Giddens' chart, but did not make any changes. She did not recall talking to Brooks about the alleged charting error, but confirmed that Brooks made the changes about 30 minutes after Beeland received the email.

6

failure to "properly administer prophylaxis before surgery and then identify and treat the resulting infection in a timely manner." As to MCCG, Giddens asserted claims for professional and ordinary negligence, alleging that MCCG's nurses and mid-level providers violated accepted medical practices and its duty of ordinary care by, among other things, not following the direct order of a physician. With the complaint, Giddens filed the expert affidavit of Michael D. Hawkins, M. D., a medical doctor who regularly performs surgeries and prescribes pre-operative antibiotics to his patients. According to Dr. Hawkins, he regularly supervises nurses and mid-levels "who are tasked with carrying out orders of physicians to administer pre-operative antibiotics to surgical patients" and that he is "familiar with the standard of care required of these nurses and mid-levels and other hospital personnel." Dr. Hawkins averred that Giddens was not administered Ancef at any time pre-operatively as ordered by Smisson, and that in his opinion,

> the nurses and mid-levels providing care to Ms. Giddens violated accepted medical practices by not following [Smisson's] order to administer preoperative antibiotics to Ms. Giddens[, and] Dr. Smisson violated accepted medical practices by failing to ensure that his orders were followed by hospital personnel . . . before proceeding with surgery.

7

According to Hawkins, such acts and omissions fell below the standard of care ordinarily employed by medical professionals under similar conditions.

On March 26, 2019, defendants filed a joint renewed motion for summary judgment, alleging that because the antibiotic was timely administered at 12:40, within one hour of the surgery start time of 13:05, there was no breach of the standard of care. As an additional ground, MCCG separately alleged that even if the antibiotics had not been timely administered, it was Anderson's responsibility to administer the pre-operative antibiotics, and as set out in her affidavit, she was not an employee of MCCG at the time of Giddens' surgery. Accordingly, it argued there is no evidence that any employee of MCCG was negligent. Giddens filed a response to the renewed motion for summary judgment on May 2, 2019. The trial court scheduled a hearing on the motion for May 6, 2019, and, on May 9, 2019, granted summary judgment to MCCG,[6] finding that

> the evidence is undisputed that MCCG did not employ the CRNA and
> it is undisputed that it was the CRNA's job to administer the pre-

---

[6] According to Giddens' brief, the trial court orally granted MCCG's motion for summary judgment at the hearing; a transcript of the hearing was not designated for inclusion in the record. The trial court also allegedly indicated that it would reserve ruling on Smisson and GNI's motion for summary judgment, but subsequently denied that motion, finding that genuine issues of material of fact remained.

8

operative antibiotics. The only allegation against MCCG by Plaintiff's affidavit expert (sic) was that "nurses and mid-levels providing care to Ms. Giddens violated accepted medical practices by not following physician orders to administer pre[-]operative antibiotics to Ms. Giddens." Affidavit of Michael Hawkins, MD., para. 8. Therefore, Plaintiff failed to provide any expert testimony that any employee of MCCG violated the standard of care. Plaintiff could show no basis for liability against MCCG.

Five days after the trial court entered its written order granting summary judgment to MCCG, Giddens moved for reconsideration, arguing that it was a violation of the standard of care for the nurses in the operating room not to assure that the antibiotic had been given prior to surgery. In support of this motion, Giddens supplemented the record with the affidavit of operating room nurse Kathryn Pate, which stated that Brooks charted an incision time of 12:05 and a "time out" entry consistent with the incision time of 12:05, and averred as follows:

> It is the responsibility of the entire operating room team to assure that antibiotics are given prior to surgery. It is the responsibility of the operating room nurses to stop the procedure if during the time out it is not confirmed that the antibiotic has been given. It is my opinion that if the incision occurred at 12:05 p.m., then the nurses providing care to Ms. Giddens, including but not limited to Tamakia Brooks, violated accepted nursing practices by failing to ensure that the physician's order

9

to administer pre-operative antibiotics to Ms. Giddens was carried out prior to surgery.[7]

The trial court refused to reconsider its ruling and denied the motion for reconsideration. Additional facts will be recited as necessary to address Giddens' arguments.

1. At the outset, we find no merit in Giddens' third enumeration of error which alleges that the trial court abused its discretion in refusing to consider Pate's expert affidavit. "[I]t is the duty of each party at the hearing on the motion for summary judgment to present his or her case in full." (Citation and punctuation omitted.) *Patel v. Kensington Community Assn.*, 340 Ga. App. 896, 898 (1) (797 SE2d 235) (2017). Giddens claims that the trial court orally granted summary judgment on grounds which had not been fully briefed or raised prior to the hearing, and, therefore, should have considered the affidavit. But, as MCCG correctly notes in its brief, Giddens was not "blindsided" by MCCG's argument that it could not be held liable because it was

---

[7] Giddens notes in her brief that after orally granting MCCG's motion for summary judgment during the hearing on the joint motion for summary judgment, the trial court "invited" Giddens to supplement the record, but there is no transcript in the record supporting this assertion. MCCG notes in its brief that the trial court's "'invitation'" came after the trial court twice orally granted summary judgment to MCCG "under verbal protest" by Giddens' counsel, and that the trial court never implied that it would consider new evidence.

Anderson's job to administer the Ancef. The argument was clearly set out in MCCG's renewed motion for summary judgment, and Anderson's affidavit was filed along with the renewed motion on March 26, 2019, a month and a half before the hearing. As MCCG further points out, we rejected a similar claim in *Piedmont Hosp. v. Reddick*, 267 Ga. App. 68 (599 SE2d 20) (2004), where the plaintiff argued that she was not given sufficient notice to be able to respond to the issue of causation when an affidavit submitted by defendant several months before the summary judgment hearing raised the issue. Id. at 73 (4). Giddens likewise had sufficient notice of MCCG's argument such that she could have complied with the filing requirement of OCGA § 9-11-56 (c) (A motion for summary judgment "shall be served at least 30 days before the time fixed for the hearing. The adverse party prior to the day of hearing may serve opposing affidavits."). The trial court did not abuse its discretion in refusing to consider Pate's expert affidavit. See *Edokpolor v. Grady Mem. Hosp. Corp.*, 347 Ga. App. 285, 288 (2) (819 SE2d 92) (2018). Regardless, as we explain in Division 2, infra, there is evidence in the record, even without Pate's affidavit, to reverse the grant of summary judgment to MCCG on Giddens' claim for professional negligence.

11

2. Giddens contends that the trial court erred by granting summary judgment to MCCG on her professional negligence claim. We agree as (a) there is a genuine issue of fact as to what time the antibiotic was administered, and (b) there is some evidence to support a finding that MCCG nurses had a duty to assure that Giddens received the antibiotic before surgery.

> Summary judgments should only be granted where, construing *all* inferences against the movant, it yet appears without dispute that the case can have but a single outcome. To entitle the defendant to a summary judgment the undisputed facts as disclosed by the pleadings and evidence must negate at least one essential element entitling plaintiff to recovery and *under every theory fairly drawn from the pleadings and evidence* and if necessary, prove the negative or nonexistence of an essential element affirmatively asserted by the plaintiff. And until movant has made a prima facie showing by evidence which demands a finding in his favor as to the particular matter, there is no duty upon the opposing party to produce rebuttal evidence.

(Citations and punctuation omitted; emphasis in original.) *Lawrence v. Gardner*, 154 Ga. App. 722, 724 (270 SE2d 9) (1980). Further, "[i]n summary judgment proceedings, the court cannot weigh the evidence or determine its credibility. Where the facts as testified to by the parties create a conflict in the evidence as to a material issue, summary judgment is precluded." *Dills v. Bohannon*, 208 Ga. App. 531, 533

12

(1) (431 SE2d 123) (1993). Moreover, as set out above, "all reasonable conclusions and *inferences* drawn from the evidence are [to be] construed in the light most favorable to the nonmovant." (Citation and punctuation omitted; emphasis supplied.) *MCG Health v. Barton*, 285 Ga. App. 577, 578 (647 SE2d 81) (2007). And, when more than one inference can be drawn from the evidence, "[i]t is the jury's function to draw an inference from [that] evidence." *Thompson v. Crownover*, 259 Ga. 126, 130 (6) (381 SE2d 283) (1989). Because the evidence regarding the incision start time was susceptible to more than one inference, it is the jury rather than the trial court who should resolve the legitimacy of the modification to Giddens' chart.

We further point out that in its brief, MCCG stated that "this Court need not consider any facts pertaining to the *disputed* incision time in order to affirm the trial court's grant of summary judgment to MCCG." Pretermitting whether MCCG has conceded that an issue of fact remains as to the incision time, we find that the issue here bears a striking resemblance to the case of *Morse v. Flint River Community Hosp.*, 215 Ga. App. 224 (450 SE2d 253) (1994), where there was a factual dispute as to whether a nurse timely notified the plaintiff's supervising physician of the plaintiff's worsening condition. Id. at 226. While deposition testimony of the nurse and physician showed timely notification, a notation in the nursing records showed

13

the opposite. Id. We rejected the defendants' claim that there was no factual issue for resolution, finding that this was "not a case of conflict between circumstantial and direct evidence" as the medical records were not silent on the issue. Id. We reversed the trial court's grant of summary judgment, concluding that a variance existed "between the nursing records and the testimony of [the] parties" such that a genuine issue of fact remained as to the notification time. Id. We find similarly in this case.

Additionally, at least some evidence supports a finding that MCCG through its nurses may have provided substandard medical care to Giddens by failing to ensure that Smisson's order was carried out and that the antibiotic was administered preoperatively. Hawkins' expert affidavit states that he "regularly supervised nurses and mid-levels who are tasked with carrying out the orders of physicians to administer pre-operative antibiotics to surgical patients" and that he is familiar with the standard of care required of them. He further averred that "[i]t is my opinion that the nurses and mid-levels providing care to Ms. Giddens violated accepted medical practices by not following physician orders to administer preoperative antibiotics to [her, and] that Dr. Smisson violated accepted medical practices by failing to ensure that his orders were followed by hospital personnel. . . ." MCCG argues that summary judgment in its favor should be affirmed because the expert affidavit alleges *only that*

14

*Smisson failed to ensure* that pre-operative antibiotics were given to Giddens, and no such allegation was made against MCCG or its nurses. But, we decline to adopt such a narrow reading of the affidavit in this case.

> A plaintiff cannot prevail on motion for summary judgment by merely presenting a conclusory opinion that defendant was negligent or failed to adhere to the professional standard. She must state the particulars. She must establish the parameters of the acceptable professional conduct and set forth how or in what way the defendant deviated therefrom. Every defendant has the right to be advised what harm he has done, and in every case a plaintiff must show prima facie that a negligent act has been committed. However, explicit conclusory pronouncements out of the mouths of those clothed with the mantle of evidentiary expertise are not essential. The language in the affidavit may lack the precision indicated from a literal reading of our opinions. But utilization of a common-sense approach to its sufficiency as mandated by *Jackson v. Gershon*, 251 Ga. 577 (308 SE2d 164) (1983), with a view of the proof in favor of the party opposing the motion, requires our holding that genuine issues of material fact remain.

(Citations and punctuation omitted.) *Traylor v. Moyer*, 199 Ga. App. 112, 113 (404 SE2d 320) (1991). See *Jackson*, 251 Ga. at 570 (even though plaintiff's/respondent's expert never accused defendant doctor of negligence, and his expert testimony did not include the magic words, "'in accordance with standard medical practice,' . . . [his]

testimony showed that he had grave doubts about whether [plaintiff's] surgery was conducted properly"; thus grant of summary judgment to doctor was erroneous). In *Sanders v. Ramo*, 203 Ga. App. 43 (416 SE2d 333) (1992), this Court cited to *Jackson*, and reiterated that "[t]he failure of a medical expert to use 'magic words' in accusing a colleague of negligence in a medical malpractice case will not deprive his opinion of all efficacy where it is clear that the witness is of the opinion that the colleague failed to exercise due care in treating the patient." Id. at 45 (2). This reasoning is equally applicable to MCCG and its nurses. Thus, we will examine the facts in the record in light of Hawkins' opinions to determine if any genuine issues of material fact remain for a jury. See id.

While Hawkins' affidavit is not precise, a complete and fair reading of it leads to the conclusion that, in his expert opinion, MCCG nurses breached the standard of care by failing to ensure that pre-operative antibiotics were administered to Giddens within one hour prior to her surgery. And, the collective testimonies of Brooks, Smisson, and Beeland support this opinion. During Smisson's deposition, Giddens' counsel asked the doctor to walk him through the steps of surgery from incision to close. Smisson described generally how a craniotomy is performed from the patient being brought into the operating room and put under anesthesia, to the closing of the

16

incision and awakening of the patient, and noted that "prior to incision you have what we call a timeout (sic), and there's sort of a standard that they go through that includes the correct side of the head, includes antibiotics given which is part of the standard timeout (sic) procedure." Smisson later deposed that a time out typically takes five minutes or less and that the circulating nurse calls the time out, though sometimes the doctor may call a time out. When asked if it was primarily his job to make sure that the time out is done, Smisson testified, "No. . . . I think it's sort of everybody's responsibility." Smisson confirmed that it was his job "to make sure [a] timeout (sic) is done as well." He later deposed that it is a standard of care to give pre-operative antibiotics.

Beeland testified during her deposition that Surgical Care Improvement Project ("SCIP") guidelines required antibiotics to be given within 60 minutes of incision time for surgery, and that MCCG followed SCIP guidelines. Beeland further testified that the Safe Surgery Checklist policy was in place and used at MCCG, and that when a time out is performed, it is the circulating nurse's job to confirm all items on the checklist. She also explained that the time out checklist is part of the patient's electronic record and includes details such as antibiotics and allergies. But Beeland also deposed that the circulating nurse does not document antibiotics, and that it is

17

"anesthesia's responsibility to make sure antibiotics are given. . . . Anesthesia is responsible for antibiotics." Beeland later clarified that it is her practice to discuss antibiotics during the time out and find out what time they were given. When pressed to confirm that it was the circulating nurse's job under MCCG policy to verify that anesthesia has administered antibiotics, Beeland testified that "It's a team effort. Everybody in the room is responsible for being part of that time out process. And the team works together to answer those questions[;]" anesthesia, the circulating nurse, and the surgeon. When asked by Giddens' counsel, "[a]nd so one of the things that the team, the surgeon, the nurse, the anesthesia, all of them are supposed to confirm during the time out that antibiotics have been provided," Beeland responded that it is everyone's responsibility, and it is part of the time out process. When asked if the failure to discuss antibiotics during a time out is a violation of the standard of care, Beeland responded, "I'm not an expert on the standard of care." When asked to confirm if the SCIP guidelines require completion of a time out procedure, Beeland replied that she did not have the SCIP guidelines in front of her, but that "[y]ou discuss antibiotics within your time out."

During her deposition, Brooks testified that as the circulating nurse in the operating room, she is responsible for calling the time out, and going through the

18

checklist to "make sure everybody is on the same page on the issues of the checklist." The checklist is the same for every procedure, and a "time out" checklist was used during Giddens' procedure. With respect to the checklist used during Giddens' procedure, Brooks explained that in the "antibiotic section" of the time out checklist, she handwrote "Ancef, one gram at 1240." Brooks verbally obtained that information from anesthesia and then documented it on the checklist. Brooks stated that she is not responsible for giving antibiotics, and the only responsibility she has for documenting when antibiotics were given is "[n]one other than this [checklist] that [she] wrote on" which information she obtained from anesthesia. While Brooks was never asked if she was responsible for ensuring that antibiotics were administered, during her explanation for why she modified the time on Giddens' chart, Brooks stated that "a call to order, a time-out, . . . is done before cut, incision, it has to be done before. Everything has to be draped. Everybody has to be standing at attention. And when I give the okay that it's done, and everybody is introduced and everything is done, that's when [the incision is] done. It's a minute afterwards." Brooks testified that it was anesthesia's job, and not nursing staff's job to ensure that the antibiotic ordered by the physician matched what was sent to the operating room. While Brooks does

19

not administer the Ancef, it is her practice during the time out to ask if the antibiotic has been administered.

According to these witnesses, there is some evidence that MCCG circulating nurses had some responsibility for ensuring that antibiotics were administered before surgery; that CRNA Anderson opined that it is her responsibility alone does not summarily relieve MCCG nurses of all responsibility in ensuring the administration of pre-operative antibiotics. See, e.g., *McDonald v. St. Francis Hosp.*, 139 Ga. App. 69, 71 (227 SE2d 813) (1976) ("[i]t is for the jury decide who is responsible for what occurred, not the witness"). Because Hawkins' affidavit was sufficient to create a genuine issue of fact as to MCCG's professional negligence, the trial court erred in granting its motion for summary judgment on this claim. See *Lee v. Phoebe Putney Mem. Hosp.*, 297 Ga. App. 692, 694 (2) (678 SE2d 340) (2009).

3. Giddens' complaint set forth claims of both professional and ordinary negligence against MCCG. In its order granting summary judgment to MCCG, the trial court also entered final judgment in its favor. Giddens contends that the trial court erred in granting summary judgment to MCCG on her ordinary negligence claim. We disagree that Giddens' claim is one for ordinary negligence.

As this Court has held,

whether an action alleges professional malpractice or simple negligence depends on whether the professional's alleged negligence required the exercise of professional judgment and skill. It is a question of law for the court to decide. A professional negligence or professional malpractice claim calls into question the conduct of the professional in his area of expertise. Administrative, clerical, or routine acts demanding no special expertise fall in the realm of simple negligence. We have previously held that a nurse's failure to activate an alarm, as a doctor ordered, was ordinary negligence. Likewise, claims that employees failed to carry out instructions and that hospitals failed to have appropriate equipment alleged ordinary negligence. However, if a claim of negligence goes to the propriety of a professional decision rather than to the efficacy of conduct in the carrying out of a decision previously made, the claim sounds in professional malpractice.

(Citation and punctuation omitted.) *Wellstar Health System v. Painter*, 288 Ga. App. 659, 661-662 (655 SE2d 251) (2007). See *James v. Hosp. Auth. of City of Bainbridge*, 278 Ga. App. 657, 659 (629 SE2d 472) (2006) ("[w]hether an act or omission sounds in simple negligence or medical malpractice depends on whether the conduct, even if supervisory or administrative, involved a medical judgment[;] '[m]edical judgments' are decisions which normally require the evaluation of the medical condition of a particular patient and, therefore, the application of professional

21

knowledge, skill, and experience"). See also *St. Mary's Health Care System v. Roach*, 345 Ga. App. 274, 277 (811 SE2d 93) (2018).

The testimonies of Smisson, Beeland, and Brooks, as detailed above, show that Giddens' claim is one for professional negligence and not ordinary negligence. Giddens urges that the failure of MCCG nurses to follow Smisson's order did not involve professional medical decision-making, but rather was akin to the failure of hospital employees to follow a doctor's order to activate the alarm on a patient's apnea monitor, an act of ordinary negligence. See *Dent v. Mem. Hosp. of Adel*, 270 Ga. 316, 318 (509 SE2d 908) (1998). We are not persuaded by this argument.

While we agree that a hospital employee's failure to carry out instructions can constitute ordinary negligence, we find the circumstances of this case more in line with *Pattman v. Mann*, 307 Ga. App. 413 (701 SE2d 232) (2010). In that case, the plaintiff sued the hospital and nursing staff for wrongful death, alleging that their failure to obtain blood and administer a blood transfusion to her husband in a timely manner, as ordered by the husband's doctor, caused his death. Id. The trial court granted summary judgment to the defendants, ruling that the plaintiff's claim was one for professional negligence which required an expert affidavit. Id. This Court affirmed, finding that the issue was not that an employee failed to make a simple

22

phone call advising that the blood was ready, but that hospital employees had not administered the treatment to the decedent in a timely manner, resulting in his death: "Whether or not the treatments ordered by [the doctor] and carried out by [hospital] employees were timely, . . . is a question of medical judgment and the duties involved in the administration of medications and treatments constitute a professional service." Id. at 416. Likewise, whether or not the administration of Ancef in this case was timely is a question of medical judgment. Brooks' deposition testimony implies that surgery will not proceed until the circulating nurse is satisfied that all pre-operative procedures have been completed. Such a responsibility is more than a mere clerical or administrative act; rather it raises issues involving medical judgment and the professional duties required in assuring that a patient is provided proper pre-operative care and then a determination of whether an operation should proceed. Indeed, failure to assure proper medical care is a claim which has been "held to fall within the realm of professional medical decision making." *Ziglar v. St. Joseph's/Candler Health System*, 341 Ga. App. 371, 374 (800 SE2d 395) (2017). Compare *Brown v. Tift Health Care*, 279 Ga. App. 164, 167 (630 SE2d 788) (2006) (claim that nursing care facility staff failed to properly document elderly patient's fall was one of ordinary negligence). And, "[c]ontrary to [Giddens'] argument, this is not a case involving

merely administrative actions by the employees, such as simply moving the patient or leaving the patient unsupervised and unrestrained." (Citation and punctuation omitted.) *Pattman*, 307 Ga. App. at 417. Accordingly, the trial court did not err in granting summary judgment to MCCG on Giddens' claim for ordinary negligence.

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Mercier, J., concur.*